IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In Re: CATERPILLAR, INC., C13 AND C15 ENGINE PRODUCTS LIABILITY LITIGATION | HONORABLE JEROME B. SIMANDLE<br><br>MDL No. 2540<br><br>Master Docket No. 1:14-cv-3722 (JBS-JS)<br><br>**OPINION** |

APPEARANCES:

James E. Cecchi, Esq.
Zach S. Bower, Esq.
Lindsey H. Taylor, Esq.
CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
    -and-
Natalie Finkelman Bennett, Esq.
James C. Shah, Esq.
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
475 White Horse Pike
Collingswood, NJ 08107
    -and-
Leslie Kroeger, Esq.
Theodore Jon Leopold, Esq.
Douglas J. McNamara, Esq.
COHEN MILSTEIN SELLERS & TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
    -and-
Richard J. Burke, Esq.
Zachary A. Jacobs, Esq.
QUANTUM LEGAL LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
    Attorneys for Plaintiffs

Joseph F. Falgiani, Esq.
James Holsey Keale, Esq.

```
SEDGWICK LLP
One Newark Center
1085 Raymond Boulevard, 16th Floor
Newark, NJ 07102
     -and-
Robert G. Abrams, Esq.
Darin R. Bartram, Esq.
Robert J. Brookhiser, Jr., Esq.
Gilbert S. Keteltas, Esq.
Jonathan L. Lewis, Esq.
Elliot Morrison, Esq.
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W., Suite 1110
Washington, D.C. 20036
     Attorneys for Defendant
```

**SIMANDLE, Chief Judge:**

I.   INTRODUCTION ............................................... 3

II.  BACKGROUND ................................................. 7

**A. Facts ...................................................... 7**

  1. The MY 2007 CAT Engine Emission System.................... 7

  2. Alleged defects in the Engine Emissions System........... 9

  3. Caterpillar's knowledge of the alleged defect........... 10

  4. Warranty coverage associated with the Engines........... 12

**B. Procedural history ....................................... 14**

**C. Parties' arguments ....................................... 17**

III. STANDARD OF REVIEW ........................................ 21

IV.  DISCUSSION ................................................ 22

**A. Caterpillar's motion to dismiss or for judgment on the
    pleadings based on preemption ........................... 22**

  1. The Clean Air Act and associated regulations............ 23

2. Express preemption.......................................... 26

3. Implied preemption.......................................... 39

4. Subject matter jurisdiction................................ 47

5. Failure to allege a failed emissions test................ 49

**B. Caterpillar's motion to dismiss .......................... 54**

1. Express warranty............................................ 54

2. Implied warranty............................................ 89

3. Breach of contract claims................................. 95

4. Consumer protection claims............................... 97

5. Specific state law issues................................ 114

6. New Jersey good faith and fair dealing claim........... 122

7. Ohio negligent design..................................... 124

8. Statute of limitations.................................... 126

V.  CONCLUSION ............................................ 135

**I.   INTRODUCTION**

In this consolidated multi-district litigation ("MDL"),

Plaintiffs[1] are initial or subsequent users, purchasers, owners,

---

[1] The Plaintiffs in this action consist of the following: Ronald Bagley (**Utah**); Bailey Coach Inc. (**Pennsylvania**); Brian Brown (**Missouri**); BK Trucking Co. (**New Jersey**); Leroy Bolton Trucking Co. (**Ohio**); David Brewer (**Maryland**); Bryant's Transport, Inc. (**Texas**); C&F Movers, Inc. (**Florida**); Columbia Petroleum Transportation, LLC (**New York**); DeCamp Bus Lines (**New Jersey**); Eagle Valley South, Inc. (**Illinois**); Easton Coach Company (**Pennsylvania**); Eclipse Charters & Tours, LLC (**Indiana**); First Priority Tours, Inc., d/b/a First Priority Trailways (**Maryland**); G&G Specialized Carriers, LLC (**Wisconsin**); Gentry Coach Company, d/b/a Gentry Trailways (**Tennessee**); Harmon Brothers Charter Services, Inc., (**Georgia**); John Lamanteer (**New Jersey**); K Double D, Inc. (**Colorado**); Kelton Tours Unlimited LLC (**Alabama**); Edward Charles McLean (**North Carolina**); MNS Enterprises, Inc. (**Texas**);

and lessors of vehicles with a 2007, 2008, 2009, or 2010 C13 or
C15 heavy duty on-highway diesel engine (collectively, "MY 2007
CAT Engines") manufactured by Defendant Caterpillar, Inc.
("Caterpillar" or "CAT"). Plaintiffs allege that the MY 2007 CAT
Engines, equipped with an emissions control system specifically
designed to comply with the Environmental Protection Agency's
("EPA") 2007 Heavy Duty On-Highway Emissions Standard ("2007
Emissions Standard"), are defective and render Plaintiffs'
vehicles inoperative on account of repeated and endemic engine
failure, deratings, and shutdowns. Plaintiffs contend that
Caterpillar knew that the Engines were defective prior to
marketing, selling, and warranting them to Plaintiffs. After
repeated failed attempts at repair, including thousands of
repairs involving the 34 Plaintiffs in this action, it is
apparent, according to Plaintiffs, that the defect is
irreparable, causing significant repair costs and substantial

---

NW Navigator Luxury Coaches LLC (**Oregon**); Roadrunner Charters,
Inc. (**Texas**); Salud Services, Inc. d/b/a Endeavor Bus Lines
(**Florida**); S&M Mercado, Inc. (**California**); German Saravia
(**California**); Scenic Boundaries Trans., Inc. (**Minnesota**); Tri-
City Charter of Bossier, Inc. (**Louisiana**); U.S. Transport (**New
Mexico**); Vandalia Bus Lines, Inc. (**Illinois**); White Knight Limo,
Inc. (**Missouri**); Ricky A. Williams (**Michigan**); and Windy City
Limo (**Illinois**). Plaintiffs voluntarily dismissed their claims
on behalf of Morris Inc. (**South Dakota**) and the Bones Company
(**Kansas**) on January 30, 2015 prior to the filing of the instant
motions to dismiss. [Docket Items 118 & 119.] Additionally,
following oral argument, Plaintiff KLS Enterprises, LLC
(**Indiana**) voluntarily dismissed its claims against Caterpillar.
[Docket Item 166.]

4

diminution in the value of Plaintiffs' vehicles. Due to the irremediable defect in the MY 2007 CAT Engines, Caterpillar has allegedly ceased the sale of these Engines.

This matter comes before the Court on two motions to dismiss by Caterpillar. Caterpillar's motion to dismiss or for judgment on the pleadings argues that Plaintiffs' claims are entirely preempted by federal law, namely the regulatory scheme empowering the EPA to regulate on-highway diesel emissions, through which the EPA certified the Engines as compliant with the 2007 Emissions Standard. [Docket Item 121.] Alternatively, in Caterpillar's motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., Caterpillar contends that Plaintiffs' claims for breach of express and implied warranties, as well as their claims under the various state consumer protection laws must fail as a matter of law.[2] [Docket Item 120.]

Caterpillar's preemption argument requires the Court to determine the nature of Plaintiffs' claims and the relief sought and whether such claims are expressly or impliedly preempted by the EPA's emissions regulatory scheme. The Court is largely unpersuaded by Caterpillar's preemption argument because, as expressly stated in the ACCAC, this is not a case about

---

[2] Caterpillar also seeks dismissal of Plaintiffs' claims for breach of contract under Florida, Maryland, and Utah law, for breach of the implied covenant of good faith and fair dealing under New Jersey law, and for negligent design under Ohio law.

emissions. Plaintiffs do not allege that defects in the Engines caused Plaintiffs' vehicles to exceed the 2007 Emissions Standard. Instead, this case is about defects in the Engines which, in many cases, caused Plaintiffs' vehicles to completely shut down, rendering them undrivable. Plaintiffs' principal allegation is that the Engines emit no emissions at all because they are entirely defective. Far from a court order substantively altering the EPA's emissions standards or the enforcement thereof, Plaintiffs in this action seek compensatory damages for what they allegedly never received - a minimally functioning vehicle.

Caterpillar's contentions regarding the substance of Plaintiffs' claims turn on the language of the two express warranties associated with the Engines and various state law principles regarding implied warranties and consumer protection in 23 states.

For the reasons discussed below, the Court will grant in part and deny in part Caterpillar's motion to dismiss or for judgment on the pleadings based on preemption. The Court finds only Plaintiffs' claim for breach of the Federal Emissions Control Warranty preempted by federal law because, unlike their other claims, this claim requires a showing that the Engines failed to conform to EPA regulations and clearly implicates the EPA's extensive vehicle emissions enforcement regime. Likewise,

the Court will grant in part and deny in part Caterpillar's motion to dismiss under Rule 12(b)(6). Although the Court will dismiss Plaintiffs' breach of implied warranty claims and certain other state law claims, the Court will permit Plaintiffs' express warranty claims to proceed based on an alleged breach of the Engine Warranty, as well as the majority of Plaintiffs' consumer protection claims based on a failure to disclose a known defect in the Engines.

## II.  BACKGROUND

### A.  Facts

The Court accepts as true for purposes of the instant motions the following facts from Plaintiffs' Amended Consolidated Class Action Complaint ("ACCAC"). Plaintiffs are users, purchasers, subsequent purchasers, owners, subsequent owners, and lessors of vehicles with a MY 2007 CAT Engine certified as compliant with the EPA's 2007 Emissions Standard manufactured by Caterpillar. (ACCAC [Docket Item 105] at 1-2.)

### 1.  The MY 2007 CAT Engine Emission System

Caterpillar designed, manufactured, sold, and warranted MY 2007 CAT Engines with an exhaust emission control system, known as the Caterpillar Regeneration System ("CRS"), intended to reduce air pollutants, particularly oxides of nitrogen and particulate matter, in compliance with the EPA's 2007 Emissions Standard. (Id. ¶ 1.) Caterpillar designed the CRS, branded

7

"ACERT" (Advanced Combustion Emissions Reduction Technology), to reduce emissions by trapping particulate matter ("PM") (i.e., soot) from the combustion process in the Diesel Particulate Filter ("DPF"). (Id. ¶ 47.) The PM is then supposed to be burned off and oxidized through a "regeneration" process which requires consistent temperatures in excess of 1,000 degrees Fahrenheit. (Id.) In designing the CRS, Caterpillar opted not to utilize a Diesel Oxidation Catalyst ("DOC") to facilitate regeneration, technology which Caterpillar used in heavy duty on-highway diesel engines produced before 2007 and which Caterpillar currently uses in such engines. (Id. ¶ 50.) Instead, the CRS utilizes an Aftertreatment Regeneration Device ("ARD") to provide additional heat for regeneration. (Id. ¶ 51.)

Constant monitoring and control of the exhaust temperature is essential to the proper function of the CRS. (Id. ¶ 52.) For this purpose, the CRS uses an Electronic Control Module ("ECM") which continuously monitors all systems of the MY 2007 CAT Engine and ensures that soot levels remain at operational levels. (Id. ¶ 53.) The ECM is programmed to recognize and record regeneration failures, inform the operator of same, and initiate protective action when necessary to prevent exceeding the EPA emissions standards. (Id.) When a CRS regeneration failure occurs, the ECM diagnoses the failure, then triggers the Check Engine Light, derates the engine, or initiates an engine

shutdown protocol. (Id. ¶ 54.) If the failure goes uncorrected, the ECM proceeds through these protective measures. (Id.) Engine "derating" involves decreasing engine horsepower and speed, theoretically permitting the vehicle to proceed to an authorized dealer/repair facility. (Id.) Engine shutdown renders the engine inoperable. (Id.) When a regeneration failure occurs, the vehicle must be serviced at an authorized CAT repair facility. (Id.)

In addition to diagnosing problems assigned specific "diagnostic codes," the ECM records the protective responses (e.g., Check Engine Light, derating, shutdown) for later review. (Id. ¶ 55.) As such, CRS-related failures can be identified and analyzed by accessing the stored ECM data for each vehicle. (Id.)

## 2.  Alleged defects in the MY 2007 CAT Engine Emissions System

Plaintiffs allege that the CRS is unable to maintain reliable thermal management of exhaust temperatures as required to achieve regeneration under all operating conditions and applications. (Id. ¶ 59.) As a result, the CRS's protective measures frequently and repeatedly render the vehicles inoperable and require remediation by authorized Caterpillar technicians using proprietary Caterpillar equipment and methods. (Id.) Protective measures, including illumination of the Check

Engine Light, derating, and engine shutdown, persist and remain endemic despite numerous remediation attempts through authorized "repair and replacement." (Id. ¶ 60.) Each of the plaintiffs' vehicles was equipped with MY 2007 CAT Engines which experienced numerous CRS failures, resulting in repeated breakdowns; lengthy, ultimately unsuccessful, repair attempts; significant reduction in vehicle value;[3] and out-of-pocket expenses such as towing bills, repair invoices, and lodging and transportation charges. (Id. ¶ 61.) Plaintiffs contend that the defect in the CRS cannot be fixed or corrected, and thus, all vehicles with MY 2007 CAT Engines must be replaced. (Id. ¶ 63.) Indeed, Plaintiffs believe that Caterpillar stopped manufacturing the MY 2007 CAT Engines in 2009-2010 because the defect in the CRS could not be corrected. (Id. ¶ 64.)

### 3.    Caterpillar's knowledge of the alleged defect

Plaintiffs allege that Caterpillar knew, or should have known, that the CRS could not function on consistent and reliable basis. (Id. ¶ 56.) Plaintiffs contend that Caterpillar has known since at least 2006 that the CRS parts and components were incapable of achieving the represented levels of

---

[3] Plaintiffs allege that they are unable to sell their vehicles without incurring substantial losses because the defects in the CRS system are well-known. (Id. ¶ 62.) In fact, Plaintiffs assert that Caterpillar's own financial company has recognized the diminished value of these vehicles. (Id.)

reliability and durability. (Id. ¶ 66.) Nevertheless, Caterpillar began sales of the MY 2007 CAT Engines in January, 2007, and substantial warranty claims related to defects in the parts and components of Caterpillar's emission control system soon followed. (Id. ¶ 65.) CAT monitored emission-related warranty claims and recognized that it had insufficient inventory to replace the warranted emission-related parts and components. (Id. ¶ 68.) Caterpillar allegedly knew that attempts to correct the defects failed. (Id.) In fact, in 2008, Caterpillar acknowledged internally that the entire MY 2007 CAT Engine population was beset by problems caused by the CRS system. (Id. ¶ 69.) Caterpillar initiated a "Field Follow" program to track CRS field performance and this metric revealed excessive failure rates within the first 100 hours of operation. (Id. ¶ 70.) The metric revealed pervasive failures as high as 65% in the first year. (Id.) Caterpillar also tracked warranty data on defective emission-related parts and components through its "Continued Product Improvement" program, through which Caterpillar unsuccessfully attempted to correct the defect in the CRS and predicted failure rates as high as 99% of associated parts and components. (Id. ¶ 71.)

**4.   Warranty coverage associated with the MY 2007 CAT Engines**

Plaintiffs' breach of express warranty claims are based on two warranties associated with the MY 2007 CAT Engines: 1) the Caterpillar Limited Warranty ("Engine Warranty") and 2) the Federal Emissions Control Warranty ("FECW"). Through the Engine Warranty, Caterpillar "warrants new 10.3 liter up to and including 18.1-liter engines sold by it for use in powering on-highway vehicles to be free from defects in material and workmanship." (Id. ¶ 72; see also Am. Compl. Ex. B [Docket Item 105-2.]) The Caterpillar Engine Warranty further provides that "THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT CATERPILLAR EMISSION-RELATED COMPONENTS WARRANTIES FOR NEW ENGINES, WHERE APPLICABLE." (Id.) The FECW warrants each C13 or C15 diesel engine "to be free from defects in material and workmanship." (Id.; see also Am. Compl. Ex. C [Docket Item 105-3.]) The FECW covers "emission related parts and components" including the "Turbocharge System, Inlet Manifold, Fuel Injection System, Crankcase Injection System, Electronic Engine Control System, Exhaust Aftertreatment System, Clean Gas Induction System, Aftertreatment Regeneration Device, and Miscellaneous valves, switches, hoses, clamps, connectors, tubing and sealing devices

12

used in the above systems." (Id.) Under the FECW, Caterpillar is required to provide "[n]ew, [r]emanufactured or repaired parts and/or components . . . required to correct the defect." (Id.)[4] In addition to these warranties, Plaintiffs maintain that Caterpillar uniformly marketed the MY 2007 CAT Engines to provide regeneration "under all conditions and all applications," without "unscheduled maintenance" for the expected life of the engine, which Caterpillar represented as 1,000,000 miles. (Id. ¶ 58.)

Plaintiffs, having repeatedly brought their vehicles for warranty related repairs without success, allege that Caterpillar breached these warranties by failing to correct the defects in warranted emission-related parts and components, "preventing the operation of MY 2007 CAT Engines under all

---

[4] The Court rejects Plaintiffs' argument that the "Federal Emission Control Warranty" is distinct from the emissions control warranties mandated by the CAA. Defendants persuasively note that the "Federal Emission Control Warranty" upon which Plaintiffs rely in part for their breach of express warranty claims is merely a description or explanation in the owners' manual of the statutorily-mandated emissions control warranties. The language in the owners' manual is nearly identical to that laid out in the statute. At oral argument, Plaintiffs argued that the language in the owners' manual is broader than what is required under the CAA. Although the durational limits may be longer than what is required by statute and the language in the owners' manual more fully describes the warranty coverage, there is no mistaking this section of the owners' manual clearly identified as the "Federal Emissions Control Warranty" as anything other than what it purports to be – a description of the federally mandated emissions control warranties.

operating conditions and applications, for the reasonably expected life of the vehicles." (Id. ¶¶ 73-74.)

### B. Procedural history

The United States Judicial Panel on Multidistrict Litigation transferred this MDL litigation to the undersigned on June 11, 2014. [Docket Item 1.] At the time, the litigation consisted of five actions pending in the Eastern District of California, the Southern District of Florida, the Western District of Louisiana, the Eastern District of Pennsylvania, and the District of New Jersey.[5] Plaintiffs in these actions asserted claims against Caterpillar for breach of express and implied warranties based on the alleged defects in C13 and C15 engines manufactured by Caterpillar which resulted in repeated fault warnings, engine failures, and costly repairs. After holding the first case management conference on August 5, 2014, the Court, at Plaintiffs' urging, permitted the litigation to proceed on two parallel tracks by which cases involving trucks and buses were treated differently.[6] [Docket Item 17.]

---

[5] These actions consisted of the following: Vol-Ten Corp. v. Caterpillar, Inc., Civ. 13-2584 (E.D. Cal.); Salud Services, Inc. v. Caterpillar, Inc., Civ. 12-23927 (S.D. Fla.); Tri-City Charter of Bossier, Inc. v. Caterpillar, Inc., Civ. 13-3292 (W.D. La.); BK Trucking Co. v. Caterpillar, Inc., Civ. 13-2076 (D.N.J.); and Easton Coach Company v. Caterpillar, Inc., Civ. 14-822 (E.D. Pa.).
[6] At the time of this conference, the number of cases in this MDL had grown to 15.

14

Recognizing the relatively advanced posture of the Salud matter, including the completion of class-certification discovery, the Court permitted Plaintiffs to file a motion for class certification in Salud.[7] Simultaneously, Plaintiffs in all truck cases were to file a consolidated amended complaint.[8] In accordance with the Court's Order, Plaintiffs filed their motion for class certification in the Salud matter [Docket Item 24], as well as a Consolidated Class Action Complaint ("CCAC") on behalf of 22 truck plaintiffs, asserting claims under the laws of 19 states [Docket Item 37.] Caterpillar filed opposition to Plaintiffs' class certification motion [Docket Item 64], as well as a motion for summary judgment [Docket Item 61] and a motion for judgment on the pleadings [Docket Item 62] in the Salud matter. Thereafter, Plaintiffs argued that Caterpillar's submissions contained relevant discovery that should have been produced earlier and that required discovery to be reopened in the Salud matter. See In re Caterpillar Inc., Civ. 14-3722 (JBS/JS), 2014 WL 7183094, at *2 (D.N.J. Dec. 16, 2014).

---

[7] Salud involved purchasers and lessees of C13 bus engines in Florida, Tennessee, Illinois, Texas and Indiana.
[8] The Court temporarily stayed the Windy City and Tri-City Charter cases involving bus engines pending disposition of the class certification motion in Salud. The Court also stayed discovery in the truck cases until Plaintiffs filed a consolidated class action complaint.

As Magistrate Judge Schneider observed, the procedural history of this action up to that point "resulted in the *de facto* organization of these consolidated cases into three groups": 1) the Salud bus case involving only C13 engines; 2) the bus cases that were stayed; and 3) the remaining truck cases involving C13 and C15 engines as encompassed in Plaintiffs' CCAC. Id. at *2. When discussing this organizational structure at a November 14, 2014 status conference before Judge Schneider, Plaintiffs argued that there were no material differences between the C13 and C15 truck and bus engines and reconsidered their previous request for distinct management of the truck and bus cases. Id.

In light of Plaintiffs' apparent change of heart, Judge Schneider permitted Plaintiffs to file a motion to amend, which they did [Docket Item 84], and Caterpillar opposed [Docket Item 93]. In their motion to amend, Plaintiffs sought to include all MDL truck and bus plaintiffs in the class definition and clarify their defect claim. In re Caterpillar Inc., 2014 WL 7183094, at *2-3. Despite "some short term inefficiencies," Judge Schneider concluded that permitting Plaintiffs to amend would "set[] the course for the most efficient management of the case." Id. at *8.

Plaintiffs filed their Amended Consolidated Class Action Complaint on December 23, 2014. [Docket Item 105.] In the ACCAC,

37 named plaintiffs assert 73 counts against Caterpillar under
the laws of 25 states. Caterpillar responded with the instant
motions: Caterpillar's motion to dismiss the ACCAC under Fed. R.
Civ. P. 12(b)(6) [Docket Item 120]; and Caterpillar's motion to
dismiss under Fed. R. Civ. P. 12(b)(6) or for judgment on the
pleadings under Fed. R. Civ. P. 12(c) based on federal
preemption [Docket Item 121.] Plaintiffs filed opposition
[Docket Items 140 & 142] and Caterpillar filed replies [Docket
Items 156 & 157.] The Court heard oral argument on June 16,
2015.

### C.  Parties' arguments

Caterpillar, in its motion to dismiss or for judgment on
the pleadings, argues that Plaintiffs' claims are expressly and
impliedly preempted by the Clean Air Act and EPA regulations.
Caterpillar emphasizes that the engines at issue in this action
were designed to comply with, and were indeed certified as
compliant with, the EPA's 2007 Heavy Duty On-Highway Emissions
Standard. Caterpillar characterizes Plaintiffs' claims as an
attempt to have this Court enforce new emissions standards or
mandate a redesign of the Engines' emissions control system
despite Congress having expressly vested such enforcement
authority related to new motor vehicle emissions standards to

17

the EPA.[9] Consistent with this view, Caterpillar contends that the EPA has exclusive jurisdiction over the subject matter of Plaintiffs' pleading. Caterpillar further argues that federal regulation of emissions is so extensive that Plaintiffs' claims are impliedly preempted and clearly in conflict with the EPA's comprehensive regulatory scheme. Allowing Plaintiffs' claims to proceed, according to Caterpillar, would undermine the uniformity and predictability of federal regulation by subjecting Caterpillar's engines to the varying standards of 25 different states. Alternatively, Caterpillar argues that Plaintiffs have failed to allege that defects in the engines at issue caused the vehicles to exceed the applicable emissions standards during the warranty period as required to assert a breach of the FECW.

In response to Caterpillar's preemption argument, Plaintiffs argue that their claims are not expressly or impliedly preempted by federal law. Specifically, Plaintiffs argue that their claims are not within the scope of the CAA's preemption provision because Plaintiffs do not seek a change in Caterpillar's emission system design or emissions levels. Plaintiffs maintain that Caterpillar cannot establish field preemption because there is no evidence of Congressional intent

---

[9] Caterpillar also argues that Plaintiffs seek remedies beyond those provided by the CAA.

18

to foreclose all state law claims related to emissions systems,
nor do Plaintiffs' claims present an obstacle to complying with
federal law. Plaintiffs also reject Caterpillar's arguments
regarding exclusive jurisdiction and Plaintiffs' failure to
allege excessive emissions.

Caterpillar, in its motion to dismiss, seeks dismissal of
the ACCAC in its entirety as a matter of law. Caterpillar argues
that Plaintiffs' express warranty claims must fail because the
warranties at issue only extend to defects in materials or
workmanship, not to design defects. Caterpillar contends that
Plaintiffs impermissibly seek to expand the scope of the express
warranties by alleging unconscionability and relying on stray
marketing statements and excerpts from the owners' manual.
Caterpillar asserts that Plaintiffs' implied warranty claims
fail because Caterpillar expressly disclaimed any implied
warranties, and in any event, most Plaintiffs, as remote
purchasers, cannot assert a claim for breach of implied
warranty. Caterpillar argues that Plaintiffs' consumer
protection claims must fail because they are based on fabricated
marketing statements which no plaintiff is alleged to have seen.
Caterpillar also maintains that many of Plaintiffs' claims are
time-barred and not subject to equitable tolling.

Plaintiffs argue in response that they have sufficiently
alleged a violation of the Engine Warranty and the FECW.

Plaintiffs contend that warranties at issue should not be restricted to defects in workmanship and material because the alleged defect in the emissions control "system" distinguishes this case from other "repair and replacement" warranty cases. Plaintiffs seek to expand the scope of the warranties beyond the plain language therein by noting that Caterpillar made repeated repairs to the defect at issue during and after the warranty period. Plaintiffs further contend that Caterpillar's interpretation of the express warranties at issue is unconscionable and causes the warranties to fail in their essential purpose. Regarding their implied warranty claims, Plaintiffs contend that the disclaimer in the Engine Warranty is unenforceable because they have not alleged receipt of the Engine Warranty prior to purchase. Plaintiffs maintain that they have sufficiently pleaded their consumer fraud claims based on Caterpillar's failure to disclose a known defect prior to sale. They defend the adequacy of their pleading as to their breach of warranty, breach of the implied covenant of good faith and fair dealing, and negligent design claims. Plaintiffs also reject Caterpillar's contention that their claims are time-barred by arguing that such a determination is premature at this stage, and in any event, that various equitable doctrines operate to toll the applicable limitations periods.

20

## III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

The differences between Rules 12(b)(6) and 12(c) are purely procedural, and the pleading standards of Rule 12(b)(6) are applied for both. Turbe v. Gov't of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991). Thus, in a motion under Rule 12(c), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012).

21

A statute of limitations defense may be raised by motion under Rule 12(b)(6) if the limitations bar is apparent on the face of the complaint. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

## IV.  DISCUSSION

### A.  Caterpillar's motion to dismiss or for judgment on the pleadings based on preemption

The Court will first address Caterpillar's argument that Plaintiffs' claims are preempted by federal law.

Under the Supremacy Clause of the United States Constitution, federal law is the supreme law of the land and any conflicts between federal and state laws must be resolved in favor of federal law. Essentially, "state law that conflicts with federal law is without effect." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (citing U.S. Const. art. VI, cl. 2). "Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." Bell v. Cheswick Generating Station, 734 F.3d 188, 193-94 (3d Cir. 2013), cert. denied sub nom. GenOn Power Midwest, L.P. v. Bell, 134 S. Ct. 2696 (2014) (quoting Farina v. Nokia, 625 F.3d 97, 115 (3d Cir. 2010)).

Caterpillar's preemption argument requires discussion of the applicable statutory and regulatory framework related to

motor vehicle emissions, namely the Clean Air Act ("CAA") and the associated regulations promulgated by the EPA.

### 1.    The Clean Air Act and associated emissions-related regulations

"The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, enacted in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ("EPA")." Bell, 734 F.3d at 190. Section 202(a)(1) of the Act directs the EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7521(a)(1). The EPA is also responsible for certifying that new motor vehicle engines comply with applicable standards and regulations under the CAA. 42 U.S.C. § 7525(a)(1). The EPA issues "a certificate of conformity" if, based on EPA testing of the engine and information provided by the manufacturer, it finds that an engine conforms to the applicable emissions standards. § 7525(a)(2). See also 40 C.F.R. §§ 86.007-21, 86.007-23, 86.007-30 (2014) (describing certification process for diesel heavy-duty engines); 40 C.F.R. §§ 86.007-21, 86.007-23 (2007) (same).[10] The EPA may revoke a

---

[10] Caterpillar, relying on United States v. Chrysler Corp., 591 F.2d 958 (D.C. Cir. 1979), properly observes that the EPA may deny a certificate of conformity for reasons other than non-compliance with an emissions standard. Id. at 960 ("Nothing indicates that compliance with emission control standards is to

certificate of conformity if a heavy-duty engine fails a
subsequent emissions audit. § 86.612-97 (2014). After
certification, manufacturers must inform the EPA of emissions-
related defects which impact at least twenty-five engines,
including a description of the defect, a description of the
category of engines potentially affected, an evaluation of the
emissions impact of the defect and any drivability problems, and
any follow-up anticipated by the manufacturer. § 85.1903 (2014).
Additionally, Section 207 of the CAA "provides a mechanism for
the recall of engines when the EPA finds previously certified
engines do not conform to emissions standards." Navistar, Inc.
v. Jackson, 840 F. Supp. 2d 357, 359 (D.D.C. 2012). See also 42
U.S.C. § 7541(c)(1); 40 C.F.R. §§ 85.1801-1808 (2014).

    In the present case, the EPA issued certificates of
conformity for each model year covered by the ACCAC. Caterpillar

---

be the controlling standard."). However, Chrysler involved a
civil action by the United States against Chrysler because the
vehicles at issue did not conform to the design specifications
in the application for a certificate of conformity, which was
previously granted. Id. at 960-61. The court in Chrysler found
that manufacturers may violate the statute if the vehicles fail
to conform to the design specifications approved by the EPA
regardless of whether the vehicles comply with applicable
emissions standards. Id. at 961. Accordingly, Chrysler merely
instructs that manufactures must produce engines consistent with
the design specifications approved by the EPA in the
certification process. Chrysler is thus consistent with the view
that the certification process is principally concerned with the
ability of the engines at issue to comply with applicable
emissions standards.

contends that none have been revoked. Moreover, the EPA has not determined that the engines at issue fail to conform to applicable emissions standards.

The CAA also requires the manufacturer of a new motor vehicle engine to warrant to the ultimate purchaser and each subsequent purchaser that such engine is "(A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title)." 42 U.S.C. § 7541(a)(1). The CAA thus requires manufacturers to provide two warranties: the "Design and Defect Warranty" and the "Performance Warranty."

The CAA contains an express preemption provision, Section 209(a), which provides:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). This section also contains the following savings clause: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise

to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d).

### 2.   Express preemption

Plaintiffs' claims escape express preemption with the exception of their breach of warranty claim based on the statutorily-mandated FECW.[11]

"A federal enactment expressly preempts state law if it contains language so requiring." Bruesewitz v. Wyeth Inc., 561 F.3d 233, 239 (3d Cir. 2009), aff'd sub nom. Bruesewitz v. Wyeth LLC, 562 U.S. 223 (2011). "The congressional enactment, in other words, must be explicit about its preemptive effects." Roth v. Norfalco LLC, 651 F.3d 367, 374 (3d Cir. 2011). Courts must thus begin "by examining the 'plain wording of the clause,' as this 'necessarily contains the best evidence of Congress' pre-emptive intent.'" Bruesewitz, 561 F.3d at 239 (quoting Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63 (2002)). Although an express preemption provision may suggest the preemption of at least some state law, courts must also "identify the domain expressly pre-

---

[11] As noted above, the Court finds that the language in the owners' manual upon which Plaintiffs rely, in part, for their breach of express warranty claims is simply a paraphrase statutorily-mandated FECW. This language does not create obligations separate and distinct from what is required by statute. It is at most a more fulsome description of the obligations mandated by federal law.

empted by that language." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (quotation omitted). Two presumptions inform this determination: 1) "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" and 2) "the purpose of Congress is the ultimate touchstone in every pre-emption case." Id. at 485 (quotations and alterations omitted). See also Wyeth v. Levine, 555 U.S. 555, 565 (2009) (explaining the "two cornerstones of [the Supreme Court's] pre-emption jurisprudence").[12]

The CAA's express preemption provision is specific and unambiguous. The plain language prohibits states from adopting or enforcing "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." It also precludes states from requiring any emissions-related certification or inspection prior to sale or registration of such vehicles or engines. Both clauses are clearly directed toward state attempts to regulate emissions from new motor vehicles or engines. Although the Supreme Court has recognized that "relating to," as used in other federal statutes, suggests "a broad pre-emptive purpose," Morales v. Trans World Airlines,

---

[12] The Court rejects Caterpillar's contention that the Supreme Court in Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246 (2004) explicitly renounced the presumption against preemption in analyzing the CAA's express preemption provision.

27

<u>Inc.</u>, 504 U.S. 374, 383 (1992), the plain language of the CAA's preemption provision does not foreclose all state common law actions involving alleged defects in engines manufactured and sold to comply with applicable emissions standards.

The Supreme Court last addressed the scope of the CAA's express preemption provision as it relates to vehicle emissions in <u>Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.</u>, 541 U.S. 246 (2004). In <u>EMA</u>, the Court considered whether the CAA expressly preempted rules adopted by a California political subdivision which prohibited certain public and private actors from purchasing vehicles that did not comply with strict emissions requirements. <u>Id.</u> at 248-49. The district court concluded that the CAA's express preemption provision did not invalidate the rules based on its determination that "standard" means "only regulations that compel manufacturers to meet specified emission limits." <u>Id.</u> at 252. In construing the meaning of the term "standard" as used in the CAA, the Supreme Court found as follows:

> The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine. To meet them the vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions. This interpretation is consistent with the use of "standard" throughout Title II of the CAA (which governs emissions from moving sources) to denote requirements such as numerical emission levels with which vehicles or engines must comply, *e.g.,* 42 U.S.C. § 7521(a)(3)(B)(ii), or emission-control

28

technology with which they must be equipped, *e.g.,* §
7521(a)(6).

Id. at 253. Rejecting the lower court's distinction between
purchase restrictions and sale restrictions, the Court noted
that such a distinction "confuses standards with the means of
enforcing standards" as "borne out in the provisions immediately
following § 202," including the provisions related to the
"certificate of conformity" and the provisions related to fines
for violations of the Act. Id. at 253-54. The Court equated a
"standard" to a "command, accompanied by sanctions." Id. at 255.

Indeed, subsequent courts have understood the Supreme
Court's interpretation of "standard" to include numerical limits
on emissions or equipment and design requirements related to
emissions control, which are not at issue here. See Jensen
Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control
Dist., 644 F.3d 934, 939 (9th Cir. 2011) (holding that rules
requiring diesel engine operators to provide certain information
about engines and to pay fees "ha[d] nothing to do with
emissions standards or the control of emissions" and were not
subject to preemption); Ass'n of Taxicab Operators USA v. City
of Dallas, 720 F.3d 534, 539 (5th Cir. 2013) (discussing
"standard" articulated in EMA in terms of "numerical emission
levels with which vehicles or engines *must* comply . . . or

emission-control technology with which they *must* be equipped")
(citations omitted) (emphasis in original).

Considering the Supreme Court's interpretation of
"standard" and its subsequent application by courts of appeal,
it is apparent that most of Plaintiffs' claims are not expressly
preempted by the CAA because they do not involve the adoption or
enforcement of emissions-related standards. Plaintiffs' claims
for breach of the Engine Warranty and for breach of implied
warranties, as well as their claims for violation of various
consumer protection laws, are all based on an alleged defect
which prevents the Engines at issue from operating without
continually derating and/or shutting down. Although Plaintiffs'
claims concern technology Caterpillar designed to comply with
the EPA's emissions standards, Caterpillar acknowledges, and
indeed emphasizes, throughout its briefing that Plaintiffs do
not allege that the Engines failed to conform to such standards.
Nor do Plaintiffs seek an order prescribing alternative designs
or new technology to comply with the applicable EPA standards.
Plaintiffs instead assert claims based on the alleged failure of
Caterpillar's Engines to perform as warranted. As such, the
alleged failure is not a failure to perform as an EPA-compliant
engine, but a failure to perform as an engine at all.
Caterpillar's argument that frequent derating and shutdowns
indicate that the engine functioned as designed (to comply with

emissions standards) does not alter the Court's analysis at this stage.[13] It remains that Plaintiffs' claims for the most part do not concern an effort to adopt or enforce an emissions standard as understood in the context of the CAA as a whole.

Plaintiffs' claims which seek enforcement of express and implied warranties for defects in the Engines' emissions systems, as well as those based on consumer fraud and negligent design, are hardly comparable to efforts by state and local governments to adopt or enforce emissions standards or to require additional certifications or inspections prior to sale. See, e.g., Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246 (2004) (finding that the CAA expressly preempted local rules prohibiting certain public and private actors from purchasing vehicles that did not comply with strict emissions requirements); Sims v. State of Fla., Dep't of Highway Safety & Motor Vehicles, 862 F.2d 1449, 1455 (11th Cir. 1989) (finding that the CAA expressly preempted state statute which

---

[13] At this stage, the Court must draw all reasonable inferences in Plaintiffs' favor. Accordingly, it would be improper to accept Caterpillar's argument that the frequent deratings and shutdowns about which Plaintiffs complain were the necessary result of a properly functioning system designed to comply with EPA emissions standards – a contention which clearly presents a factual question inappropriate at this time. The Court's analysis may change, however, if after discovery it is undisputed that the defect underlying Plaintiffs' claims requires redesign of the emissions control system and subsequent EPA approval.

required certification of compliance by EPA and other federal agencies prior to sale and registration of imported "gray market" automobiles); Direct Auto. Imports Ass'n, Inc. v. Townsley, 804 F.2d 1408, 1411 (5th Cir. 1986) (same); In re Office of Attorney Gen. of State of New York, 709 N.Y.S.2d 1, 9 (N.Y. App. Div. 2000) (characterizing claims by the Attorney General as attempt to enforce federal emissions standards through state common law and thus finding such claims preempted by the CAA). Fundamentally, unlike plaintiffs in these cases, Plaintiffs' claims here do not require a showing that Caterpillar's Engines either did or did not comply with emissions standards.

Nor is this a recall case in which vehicles allegedly fail to conform to federal emissions standards. See Navistar, Inc. v. Jackson, 840 F. Supp. 2d 357, 366 (D.D.C. 2012) (concluding that the EPA had not yet determined that engines at issue were nonconforming as required to initiate a recall); Chrysler Corp. v. U.S. Envtl. Prot. Agency, 631 F.2d 865, 896 (D.C. Cir. 1980) ("We find substantial evidence in the record to support the Administrator's conclusion that Chrysler vehicles in the recall class fail to conform to federal carbon monoxide emission standards when in actual use, although properly maintained and used, and thus that Chrysler must submit a plan for remedying the nonconformity, in accordance with the Act.").

Of the cases cited by Caterpillar, only <u>Jackson v. Gen. Motors Corp.</u>, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), bears a modest resemblance to this action, yet it is readily distinguishable. In <u>Jackson</u>, plaintiffs asserted claims for negligence and strict product liability against manufacturers of urban transit buses and diesel engines for harm allegedly caused by plaintiffs' exposure to diesel exhaust fumes. <u>Id.</u> at 572. Noting that the Supreme Court in <u>Cipollone</u> found certain common law actions preempted because "it is the essence of the common law to enforce duties," the court in <u>Jackson</u> reasoned that the more explicit reference to "enforcement" in the CAA made clear that "a state common law tort action that questions whether a defendant complied with standards promulgated under the CAA is an example of a state attempting to enforce the CAA, and is therefore subject to preemption." <u>Id.</u> at 575. However, as noted above, Plaintiffs in this action do not question whether Caterpillar complied with standards promulgated under the CAA.[14]

---

[14] The present case is also distinct from <u>Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.</u>, 627 F.2d 1095 (D.C. Cir. 1979), which concerned whether the EPA could waive federal preemption of California regulations limiting the amount of maintenance a manufacturer could require vehicle purchasers to perform after sale. <u>Id.</u> at 1104. The court found that California's in-use maintenance regulations were attempts to enforce California's emission standards, and thus subject to preemption under Section 209(a). <u>Id.</u> at 1107. Unlike the in-use maintenance requirements in <u>Motor & Equip. Mfrs. Ass'n</u>, Plaintiffs' warranty-related claims here cannot be fairly considered an attempt to enforce emissions standards or a condition precedent to initial sale. In

Nor do Plaintiffs contend that they were harmed by the failure of their Engines to comply with applicable emissions standards.[15]

The Court is also unpersuaded by Caterpillar's argument that Plaintiffs seek a change to the design of the emissions

---

Motor & Equip. Mfrs. Ass'n, it was clear that the California rules directly affected the ability of those vehicles to comply with emissions standards. To the contrary, requiring Caterpillar to correct a defect which allegedly renders Plaintiffs' vehicles inoperable need not affect the ability of those engines to comply with emissions standards. It necessarily only affects the ability of those engines to perform their essential function. Nor do Plaintiffs' claims, as Caterpillar contends, require a wholesale rewriting of the warranties issued pursuant to the CAA. Plaintiffs' breach of warranty claims merely require an interpretation of the scope of those warranties. Any incidental effect Plaintiffs' claims may have on Caterpillar's future business practices is speculative and beyond the scope of the CAA's express preemption provision.

[15] Additionally, when discussing Jackson at oral argument, Caterpillar conceded that the preemptive scope of the CAA is not unlimited. Counsel, in response to a hypothetical posed by the Court, maintained that claims like those in Jackson are preempted by the CAA, but a personal injury claim resulting from an explosion caused by a defect in an engine certified by the EPA would not be preempted. The Court agrees with defense counsel's distinction and finds the claims at issue here more akin to the Court's hypothetical personal injury case. Plaintiffs in the instant action do not assert tort claims based on the failure of the Engines to comply with EPA regulations, but rather that they have been harmed as the result of the Engines' alleged inability to function as warranted, as advertised, and as reasonably expected. Although Plaintiffs' claims are not premised on safety concerns, the Court's hypothetical and defense counsel's response make clear that the preemption analysis turns on the origin and type of harm suffered, as well as the remedy sought. As discussed throughout, the Court finds no preemption where neither the origin of the harm nor the remedy sought relates to applicable emissions standards.

control system, which would require EPA approval.[16] It is not at

all clear that Plaintiffs' demand for prompt repair and/or

replacement of all MY2007 CAT Engine defects would require a

_____

[16] Although Caterpillar emphasizes that Congress in the CAA
adopted a "technology-forcing approach to reduce vehicle
emissions," (Cat. Br. [Docket Item 121-1] at 13) (citing
Union Elec. Co. v. E.P.A., 427 U.S. 246, 257 (1976)), it is
undisputed that the EPA does not mandate the use of certain
technology, nor prescribe the design of specific emissions
systems, to achieve compliance with particular emissions
standards. In fact, both sides acknowledge that in 2012, in
response to concerns regarding derating and shutdown of
emergency vehicles equipped with engines similar to those at
issue here, the EPA decided to exempt such vehicles from the
MY2007 Standards. In publishing a direct final rule to this
effect, the EPA explained that its "standards are performance-
based, and reflect the greatest degree of emission reduction
achievable, according to CAA sections 202(a)(3) and 213(a)(3).
Our on-highway and nonroad PM standards do not specify the type
of diesel particulate filter for manufacturers to use, nor do
they even mandate the use of such a filter." Heavy-Duty Highway
Program: Revisions for Emergency Vehicles, 77 Fed. Reg. 34,130-
01, at 34,133 (EPA Jun. 8, 2012). Moreover,

> Because EPA emissions standards are performance based; and
> therefore, do not dictate any required emission control
> system technologies or configurations, each manufacturer has
> the discretion to program the timing and sequence of lamps as
> needed to inform drivers of the condition of the emission
> control system. As noted above, it is not uncommon in today's
> heavy-duty fleet for an engine's ECM to limit its maximum
> speed, torque or power when a plugging DPF is detected. These
> engine and emission control system protection measures can
> alert drivers to the need to change driving conditions to
> facilitate automatic active regeneration or to make plans to
> allow for a manual active regeneration.

Id. at 34,135. Because the applicable statutory and regulatory
scheme is performance-based and because Plaintiffs' claims do
not seek a specific design change related to emissions
compliance, Plaintiffs' claims, including those for negligent
design, cannot be expressly preempted by the CAA. However, as
noted above, the Court's analysis may change if presented with
evidence that Plaintiffs' claims would require an EPA-approved
redesign of the emissions control system.

redesign of the system and thus prior approval by the EPA.
(ACCAC at 190.) Plaintiffs emphasized at oral argument that
Caterpillar has voluntarily undertaken and notified the EPA of
at least six design changes related to the Engines at issue
without the any prior EPA approval. Moreover, Plaintiffs'
reference throughout the ACCAC to an emissions system that would
"operate under all conditions and applications, without
unscheduled[] maintenance for 1,000,000 miles" refers to
internal Caterpillar directives and marketing statements
allegedly made by Caterpillar. (ACCAC ¶¶ 46, 58.) The CAA
preemption provision does not foreclose a finding in this case
that Caterpillar made such a statement. Nor does the preemption
provision prevent manufacturers from providing warranties beyond
those required by the CAA. Contrary to Caterpillar's argument,
an outcome in Plaintiffs' favor based on a longer warranty
period or requiring repairs to or replacement of defective
Engine components would not run afoul of Congress' concern for
inconsistent state laws applicable to the control of emissions.
See H.R. Rep. No. 728, 90th Cong. (1967), 1967 U.S.C.C.A.N.
1938, 1957, 1967 WL 4082 ("The ability of those engaged in the
manufacture of automobiles to obtain clear and consistent
answers concerning emission controls and standards is of
considerable importance."); H.R. Rep. No. 294, 95th Congress
(1977), 1977 U.S.C.C.A.N. 1077, 1388, 1977 WL 16034 (expressing

concern that "vehicle manufacturers not be subject to 50 different sets of requirements relating to emissions controls which would unduly burden interstate commerce"). Plaintiffs' claims would have no effect on the applicable emissions standards and therefore could not lead to the chaotic patchwork of state standards which Congress intended to avoid in this area.

Moreover, the Supreme Court has found breach of warranty and breach of contract claims beyond the scope of similar preemption provisions. See Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 525 (1992) ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the 'requirement[s]' imposed by an express warranty claim are not 'imposed under State law,' but rather imposed *by the warrantor*.") (emphasis and alternations in original); see also Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228-29 (1995) (concluding that plaintiffs' breach of contract was not preempted by the Airline Deregulation Act's preemption provision because the "terms and conditions airlines offer and passengers accept are privately ordered obligations "and thus do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1).'"). In the present case, Caterpillar voluntarily

37

assumed the warranty obligations expressed in the Engine Warranty and Plaintiffs' claims based on a breach of this warranty is not expressly preempted by federal law.[17]

The same is not true, however, of Plaintiffs' express warranty claims based on the FECW. Unlike the express warranties at issue in Cipollone and Wolens, the FECW was not voluntarily undertaken. It is mandated by federal law as part of the statutory and regulatory scheme to ensure compliance with motor vehicle emissions standards. See 42 U.S.C. § 7541(a)(1). The CAA authorizes the federal government to pursue violations of warranty provisions in federal court or administratively. See 42 U.S.C. §§ 7522(a)(4)(D), 7523, 7524. Accordingly, the FECW is part of the enforcement scheme under the CAA. As discussed infra, to trigger the manufacturer's obligations under the FECW, the emissions-related parts or components must cause the vehicle

---

[17] Similarly, the Supreme Court has found both common law and statutory fraud claims not preempted by the Federal Cigarette Labeling and Advertising Act ("FCLAA") where such fraud claims were based on a duty not to deceive. See Altria Grp., Inc. v. Good, 555 U.S. 70, 81 (2008) (holding that plaintiffs' claims under the MUTPA were not preempted by the FCLAA because "[t]he duty [not to deceive] codified in that state statute, like the duty imposed by the state common-law rule at issue in Cipollone, has nothing to do with smoking and health"). In the present case, Plaintiffs' fraud claims are premised on misrepresentations or omissions regarding the Engines' propensity to derate and shutdown. The duty not to deceive as embodied by the various state consumer protection laws upon which Plaintiffs rely has nothing to do with emissions control systems.

or engine to not conform to EPA regulations. It is therefore untenable for Plaintiffs to argue that there can be no preemption because their claims do not relate to the ability of the Engines to comply with EPA standards or depend upon a showing of non-conformity. In light of the Supreme Court's interpretation of the term "standard" in EMA, permitting Plaintiffs' claim for a breach of the FECW would be "an attempt to enforce [a] standard relating to the control of emissions from new motor vehicles or . . . engines." 42 U.S.C. § 7543(a). See also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 253-54 (2004) (discussing methods of standard enforcement). As such, Plaintiffs' claim for breach of the FECW is expressly preempted by the CAA.

For these reasons, the Court finds that only Plaintiffs' claim for breach of the FECW is expressly preempted by the CAA, and the Court will enter an Order dismissing such claim.

### 3.   Implied preemption[18]

Similarly, Plaintiffs' claims, in large part, are not impliedly preempted by the CAA, for reasons next addressed.

---

[18] Plaintiffs suggest that reaching implied preemption is "dubious" in light of language in Cipollone noting that the inclusion in a statute of an express preemption provision supports an inference that Congress did not intend to preempt other matters. (Pl. Opp. [Docket Item 140] at 27.) However, the Supreme Court has clarified that an express preemption provision does not "entirely foreclose[] any possibility of implied pre-emption" or "obviate the need for analysis of an individual

"[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively . . . or when state law is in actual conflict with federal law." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995); see also Kurns v. R.R. Friction Products Corp., 132 S. Ct. 1261, 1265-66 (2012). Implied conflict pre-emption occurs when it is "impossible for a private party to comply with both state and federal requirements . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Freightliner, 514 U.S. at 287 (quotations and citations omitted).

Caterpillar argues that federal regulation of motor vehicle emissions is so extensive that it is reasonable to infer that Congress did not intend the States to supplement it. Caterpillar also maintains that adjudication of Plaintiffs' claims in federal court would interfere with the EPA's administrative remedies, undermine the EPA's certification process, and interfere with the EPA's authority to oversee a recall.

The Court need not belabor the point. This is not a case about the ability of Caterpillar's Engines to comply with EPA

---

statute's pre-emptive effects." Freightliner Corp. v. Myrick, 514 U.S. 280, 288-89 (1995). "At best, Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." Id. at 289.

emissions standards, and as such, the remedies Plaintiffs seek are not preempted due to the breadth of the federal regulatory scheme or conflict with same.

Plaintiffs' claims fall outside the field pre-empted by the CAA and the associated regulations. Caterpillar argues that federal legislation regarding vehicle and engine emissions "so thoroughly occupies [the] legislative field as to make reasonable the inference that Congress left no room for States to supplement it." (Caterpillar Br. at 28 (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992)). See also Kurns, 132 S. Ct. at 1266 (noting the threshold question of whether the relevant statute "manifest[s] the intention to occupy the entire field" of regulation at issue). The text of the CAA does not compel such a conclusion. The CAA's express preemption provision is followed by a savings clause which explicitly states that "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d). While the Court recognizes the breadth of federal regulation in the area, the savings clause suggests that Congress did not intend to occupy the entire field of motor vehicle regulation.[19]

---

[19] The Court notes that Title I of the CAA, applicable to stationary sources of emissions, expressly contemplates and

Instead, the text of the Act explicitly contemplates continued state involvement in the regulation of motor vehicles. Even Caterpillar must concede that federal regulation of motion vehicle emissions does not extend so far as to preclude claims that do not relate to adoption or enforcement of emissions standards. This explains Caterpillar's insistence that all of Plaintiffs' claims are fundamentally about the Engines' ability to comply with the applicable emissions standards. Having largely rejected this characterization of Plaintiffs' claims, the Court also rejects Caterpillar's contention that federal regulation in this area is so extensive that Plaintiffs' claims are impliedly preempted.[20]

---

welcomes state involvement in regulating air pollution. See 42 U.S.C. § 7401(a)(3)-(4) (noting "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments" and "that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution"). Indeed, the Third Circuit has recognized that the CAA's regulatory scheme under Title I is one of "cooperative federalism." Bell v. Cheswick Generating Station, 734 F.3d 188, 190 (3d Cir. 2013). However, Section 209(a) preemption, applicable to moving sources of emissions under Title II, does not apply to stationary sources covered by Title I. The cooperative structure under Title I is therefore irrelevant to the preemptive scope of Title II.

[20] Other federal courts have rejected similar field preemption arguments under the CAA. See Ass'n of Taxicab Operators, USA v. City of Dallas, 866 F. Supp. 2d 595, 603 (N.D. Tex. 2012), aff'd, 720 F.3d 534 (5th Cir. 2013) (noting "the strong evidence of Congressional intent to preserve broad State and local

Consistent with the Court's discussion of express preemption as to Plaintiffs' claims for a breach of FECW, the Court finds such claims impliedly preempted by the federal statutory and regulatory regime related to motor vehicle emissions. Congressional intent to occupy a particular field can be no clearer than when mandating a particular course of action. In this case, the CAA expressly requires manufacturers to warrant, through the FECW, compliance at the time of sale and for a period after sale that that engine is free from defects in material and workmanship which render it noncompliant with applicable emissions regulations. Section 203 of the CAA prohibits a manufacturer from failing to comply with the "terms and conditions of the warranty under section 7541(a) or (b)." 42 U.S.C. § 7522(a)(4)(D). This Section further authorizes the federal government to pursue such violations in federal court or administratively.[21] See §§ 7523, 7524. Plaintiffs' warranty claim

_____

authority over use and operation of vehicles" and rejecting field preemption argument). Caterpillar has not identified a single case to the contrary in which a federal court has found field preemption under the CAA. The two other recent federal actions involving vehicles designed to comply with applicable EPA emissions standards, neither of which has yet to engender an opinion addressing the merits, let alone a preemption argument such as presented here, are irrelevant to the Court's field preemption analysis.

[21] Plaintiffs conceded this point at oral argument, but argued that this authority is not exclusive. In support, Plaintiffs point to a provision in the EPA's brochure interpreting the federally-required emissions warranties which notes, in addition to the EPA's authority to "investigate the failure of

for breach of the FECW is thus readily distinguishable from their other claims which are not based on a federally-mandated warranty, do not require a showing that the defect caused the Engine to not comply with applicable emissions standards, and have not been expressly designated to the federal government for enforcement. As noted above, the FECW is essentially a mechanism to enforce emissions standards and the structure and breadth of the CAA and associated regulations clearly manifests Congressional intent to occupy the field of emissions standards enforcement.

For Plaintiffs' claims based on the Engine Warranty, as well as those based on implied warranties and state consumer fraud laws, the Court also rejects Caterpillar's argument that Plaintiffs' claims conflict with federal law. It is not impossible for Plaintiffs to comply with both federal and state law because Plaintiffs' claims do not relate to compliance with federal or state emissions standards with which the CAA is concerned. The CAA and related regulations provide for certain

---

manufacturers to comply with the terms of these warranties," that "you are entitled to pursue any independent legal actions you consider appropriate to obtain coverage under the emissions warranties." (McNamara Decl. [Docket Item 140-4] Ex. 3 at 9.) The Court is unpersuaded by Plaintiffs' reference to this single sentence in the EPA brochure. Plaintiffs have identified no corresponding statutory language which would undermine the otherwise clear grant of enforcement authority to the federal government.

administrative remedies for non-compliance with federal requirements, including revocation of the certificate of conformity, initiation of recall procedures, and imposition of fines. However, because Plaintiffs' claims are not premised on non-compliance, it follows that their claims cannot conflict with these administrative remedies only triggered by non-compliance. As noted above, neither the CAA, nor the regulations regarding MY 2007 CAT Engines require the use of any particular technology or any particular design. As such, a result in favor of Plaintiffs in this action, even one based on the defective design of the emissions control system, would not conflict with or prevent Caterpillar from complying with federal law.[22]

Moreover, Plaintiffs' claims do not interfere with the EPA's certification process because this process consists of testing to ensure compliance with numerical emissions standards. Although the certification process affects design decisions made by manufacturers, the EPA does not mandate the use of a particular design. Similarly, the EPA may impose requirements regarding the durability of the emissions control system, but these durability requirements are intended to ensure compliance with applicable emissions standards over time. They do not

---

[22] Again, the Court's analysis could change if presented evidence that Plaintiffs' claims would require EPA-approved redesign of the emissions control system.

45

govern the durability of the emissions control system or the
Engine in all respects. Accordingly, the certification process
would not be undermined if this Court determined that
manufacturers are required to provide purchasers non-defective
engines that function as warranted. The same is true of the
EPA's recall process, which like the other enforcement
mechanisms is premised on non-compliance as explained above.
Plaintiffs argue persuasively that speculation regarding
duplicative costs from this action and a potential EPA recall of
the engines at issue is not a basis for preemption. See Silkwood
v. Kerr-McGee Corp., 464 U.S. 238, 257 (1984) ("Paying both
federal fines and state-imposed punitive damages for the same
incident would not appear to be physically impossible. Nor does
exposure to punitive damages frustrate any purpose of the
federal remedial scheme."); Bates v. Dow Agrosciences LLC, 544
U.S. 431, 445 (2005) ("The proper inquiry calls for an
examination of the elements of the common-law duty at issue . .
. it does not call for speculation as to whether a jury verdict
will prompt the manufacturer to take any particular action (a
question, in any event, that will depend on a variety of
cost/benefit calculations best left to the manufacturer's
accountants)."). Under the applicable regulations, Caterpillar
could institute design changes if it so chooses, as Plaintiffs
contend Caterpillar has already done on multiple occasions. See

46

Heavy-Duty Highway Program: Revisions for Emergency Vehicles, 77 Fed. Reg. 34,130-01, 34,133 (EPA Jun. 8, 2012) (noting ability of manufacturers to address issues through new applications for certification, as well as "mechanism for manufacturers to deploy field modifications to the in-use fleet, including those that are substantially similar to approved upgrades for new vehicles, as well as those that apply only to vehicles that are no longer in production"). Caterpillar may want to avoid remedial processes in the courts, as well as through the administrative process, but the desire to avoid liability does not support preemption. Ignoring the fact that the CAA's remedial measures are inapplicable to Plaintiffs' claims because they do not relate to compliance with particular emissions standards, the prospect of facing liability in two forums does not present an obstacle to complying with federal law. Therefore, the Court finds that Plaintiffs' claims are not impliedly preempted by the CAA.[23]

### 4.   Subject matter jurisdiction

Although Caterpillar does not bring a motion pursuant to Rule 12(b)(1), Fed. R. Civ. P., as a corollary to its preemption argument Caterpillar contends that the EPA has exclusive subject

---

[23] Having found Plaintiffs' express warranty claim based on the FECW expressly and impliedly preempted through field preemption, the Court finds no need to separately discuss whether this claim is impliedly preempted based on a conflict with federal law.

matter jurisdiction over the entire subject matter of
Plaintiffs' complaint. The Court rejects Caterpillar's
jurisdictional argument for the same reasons it rejected
Caterpillar's preemption arguments. There is no question that
federal regulation of motor vehicle emissions is extensive, but
an extensive regulatory regime does not equate to a grant of
exclusive jurisdiction. Caterpillar's reliance on Navistar, Inc.
v. Jackson, 840 F. Supp. 2d 357 (D.D.C. 2012) is again misplaced
because this is not a recall case and Plaintiffs do not allege
that the Engines fail to comply with the applicable emissions
standards. It is therefore wholly irrelevant that in Navistar, a
case in which the plaintiff sued the EPA to force a recall of
certain heavy duty diesel engines which allegedly failed to
comply with EPA emissions standards, the court correctly
concluded that no recall could be ordered before the EPA
determined that the engines at issue were nonconforming. Id. at
366.[24] That the EPA maintains exclusive jurisdiction over an

---

[24] Caterpillar also argues that the CAA does not create a private
cause of action for damages. However, whether a private damages
remedy exists under the CAA is less clear than Caterpillar
acknowledges. See, e.g., Bell v. Cheswick Generating Station,
734 F.3d 188, 191 (3d Cir. 2013), cert. denied sub nom. GenOn
Power Midwest, L.P. v. Bell, 134 S. Ct. 2696 (2014) (finding no
preemption of state law nuisance, negligence, and trespass
claims); N. Carolina, ex rel. Cooper v. Tennessee Valley Auth.,
615 F.3d 291, 304 (4th Cir. 2010) (finding state law nuisance
claim preempted by the CAA); Jackson v. Gen. Motors Corp., 770
F. Supp. 2d 570, 574-75 (S.D.N.Y. 2011), aff'd sub nom. Butnick
v. Gen. Motors Corp., 472 F. App'x 80 (2d Cir. 2012) ("[I]t is

administrative process which is inapplicable to this case does
not divest this Court of subject matter jurisdiction over
Plaintiffs' claims.

### 5.    Breach of FECW: Failure to allege a failed emissions test

As an alternative to Caterpillar's preemption and
jurisdictional arguments, Caterpillar also contends that
Plaintiffs' breach of warranty claims based on the FECW should
be dismissed because they do not allege that the Engines failed
an emissions test. Having generally accepted for the Court's
preemption analysis Plaintiffs' characterization of their claims
(i.e., not based on a failure to comply with applicable
emissions standards), the Court is compelled to agree with
Caterpillar that Plaintiffs' cannot state a claim for a breach

---

clear that a state common law tort action that questions whether
a defendant complied with standards promulgated under the CAA is
an example of a state attempting to enforce the CAA, and is
therefore subject to preemption."). It is noteworthy that the
subchapter pertaining to moving sources states that "Actions to
restrain such violations shall be brought by and in the name of
the United States," 42 U.S.C. § 7523, whereas the subchapter
entitled "General Provisions" contains a citizens suit provision
permitting district court actions "against any person . . . who
is alleged to have violated . . . or to be in violation of (A)
an emission standard or limitation under this chapter or (B) an
order issued by the Administrator or a State with respect to
such a standard or limitation." 42 U.S.C. § 7604(a)(1). The
Court need not resolve this ambiguity because Plaintiffs'
ability to bring a private cause of action for damages against
Caterpillar for violating the applicable emissions standards has
no bearing on their ability to bring the claims they assert in
the present action which are not premised on such violations.

of the FECW which requires an allegation that the Engines at issue failed to conform to the regulations.

The Court notes that Caterpillar's argument appears based on the faulty premise that Plaintiffs allege a breach of the federal "Performance Warranty" which, as required by the regulations, warrants against "defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title)." 42 U.S.C. § 7541(a)(1). It appears undisputed that a claim for breach of the Performance Warranty would require an allegation that Plaintiffs' Engines failed to comply with the applicable regulations. See Schmidt v. Ford Motor Co., 972 F. Supp. 2d 712, 718 (E.D. Pa. 2013) (noting that the "'Emission Performance Warranty' only guarantees that vehicles . . . will pass EPA emissions tests" and plaintiffs did "not allege that the vehicles at issue failed those tests"). Plaintiffs in opposition expressly disclaim any reliance on the "Performance Warranty" and note that the ACCAC only refers to the Engine Warranty and the FECW. Indeed, the ACCAC makes no mention of the Performance Warranty.

It is apparent, however, that a breach of the "Design and Defect Warranty" also requires a violation of the applicable

50

regulations.[25] The Court is mindful that the first paragraph of
the FECW expressly warrants conformity "with all applicable
regulations adopted" by the EPA, while the remainder does not
explicitly refer to EPA regulations or condition coverage on the
failure of an emissions test. Nevertheless, the overall context
of the FECW makes clear that warranty coverage under FECW is
premised on a defect in an emission-related part or component
which causes the engine to not conform with EPA regulations. In
Harley-Davidson Motor Co. v. Envtl. Prot. Agency, 598 F.2d 228
(D.C. Cir. 1979), the court considered a challenge to the EPA's
definition of "useful life." Id. at 229. The court dismissed as
"illusory" plaintiff's concern that the EPA's definition would
expose a manufacturer to liability for all engine failures for
the duration of a vehicles' useful life. Id. at 233 n.30. The
court explained that "the manufacturer only warrants that there
are no defects that will cause the motorcycle [t]o exceed the
emissions standards during its 'useful life.' If the engine
fails entirely (for whatever reason), it will not violate the
emissions standards, and therefore will not subject the
manufacturer to liability under the warranty." Id.

---

[25] The same is not true of the Engine Warranty, which makes no
reference whatsoever to emissions standards or emissions-related
parts and components.

51

The statutory language and related EPA guidance supports this view that the FECW requires a showing of nonconformity with EPA regulations. The plain language of 42 U.S.C. § 4521(a)(1) says as much. See 42 U.S.C. § 7541(a)(1) ("[T]he manufacturer of each new motor vehicle and new motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that such vehicle or engine is (A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title)."). EPA guidance relied on by the parties is consistent with the statutory language. See Summary and Analysis of Comments: Control of Emissions of Air Pollution from Highway Heavy-Duty Engines, EPA, Sept. 16, 1997, p. 50-51, available at http://www.epa.gov/oms/regs/hd-hwy/1997frm/hwy-s&a.pdf ("The defect warranty provides that manufacturers are responsible for defects in materials and workmanship which cause an engine not to conform with applicable regulations."); Emissions Warranties for 1995 and Newer Cars and Trucks, EPA, Sept. 2012, p. 3, available at http://www.epa.gov/obd/pubs/420f09048.pdf (describing emission related parts that are covered by the Design and Defect Warranty and noting that "[i]f any of the

parts listed below fail to function or function improperly because of a defect in materials or workmanship, causing your vehicle to exceed federal emission standards, they should be repaired or replaced under the emissions warranty if your vehicle is less than 2 years old and has been driven less than 24,000 miles").[26]

In light of the statutory text and interpretative materials from the EPA, the Court must reject Plaintiffs' attempt to parse the language of the FECW and read out any requirement that the defect cause non-conformity with EPA regulations. The interpretation that Plaintiffs urge is unsupported and unavailing.[27] Therefore, Caterpillar's motion will be granted to

---

[26] Plaintiffs appear to rely on language elsewhere in this EPA document which states, "If you or a qualified automotive technician can show that an emission control or emission related component, or a specified major, emission-control component, is defective, the repair or replacement of the part is probably covered under the Design and Defect warranty." Emissions Warranties for 1995 and Newer Cars and Trucks, EPA, Sept. 2012, p. 5. The language quoted by the Court supra, noting the condition that the defect must cause the vehicle to exceed federal emission standards, explains why the repair or replacement is "probably," but not necessarily, covered by the Design and Defect Warranty.

[27] It is not lost on the Court that, perhaps in an effort to avoid preemption, Plaintiffs have emphasized in the ACCAC, as well as in the instant briefing, that they do not allege that their Engines fail to comply with EPA emissions standards. Plaintiffs then promote a strained reading of the federally-mandated emissions warranty to ensure their express warranty claim under FECW survives. Plaintiffs' consistency is commendable, but it's also fatal to their claims for a breach of the FECW.

dismiss Plaintiffs' claim for breach of the FECW for failing to allege that the Engines at issue failed to conform to the regulations.

**B. Caterpillar's motion to dismiss**

**1. Express warranty**

Caterpillar argues that Plaintiffs' breach of express warranty claims must fail because the warranties at issue do not extend to design defects and Plaintiffs cannot expand the scope of the express warranties by alleging unconscionability. Caterpillar also asserts that Plaintiffs fail to allege a violation of EPA regulations which is required to assert a breach of the emissions warranty. Having found above that Plaintiffs' express warranty claim based on the FECW is preempted by federal law, the Court in this analysis need only consider Plaintiffs' express warranty claim based on the Engine Warranty which indisputably requires no violation of EPA regulations.

**a. Design defect**

Although Caterpillar is correct that the ACCAC is replete with references to the defective design of the Engines' emissions control system (ACCAC ¶¶ 3, 82, 83a, 83i, 83j, 84 & 95),[28] Caterpillar mischaracterizes Plaintiffs' express warranty

_____

[28] In fact, Plaintiffs' motion to amend was premised partially on the need to "clarify that the defects at issue relate to an overall poor design choice - a single design defect that spans

claims as based on the federal performance warranty mandated by the CAA. Instead, in light of the preceding, Plaintiffs' express warranty claim is based on an alleged breach of the Engine Warranty. (ACCAC ¶ 72.) Plaintiffs allege that Caterpillar breached this warranty by failing to correct a common defect among Plaintiffs' Engines resulting from the CRS' failure to regenerate. This defect allegedly caused frequent engine derating and shutdowns and rendered Plaintiffs' vehicles inoperable.

The plain language of the Engine Warranty limits Caterpillar's responsibilities to defects in material and workmanship. See Caterpillar Limited Warranty (warranting vehicles to be "free from defects in material and workmanship"). It is well-settled that design defects are distinct from defects in material and workmanship. See, e.g., Bruce Martin Const., Inc. v. CTB, Inc., 735 F.3d 750, 753 (8th Cir. 2013) ("[C]ase law supports the view that, where a product is manufactured correctly but designed inappropriately, the defect is one of design and not 'material or workmanship.'"); Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc., 508 F. App'x 180, 184 (3d Cir.

---

C13 and C15 MY2007 CAT Engines, regardless of engine type or application." (Pl. Mot. to Amend [Docket Item 84-1] at 1.) Additionally, Plaintiffs reaffirmed at oral argument that their allegations are based, at least in part, on an alleged design defect.

2012) (noting that plaintiff "stretches the ordinary definition of 'workmanship' by trying to fit 'design' within it"); Cooper v. Samsung Electronics Am., Inc., 374 F. App'x 250, 253 (3d Cir. 2010) (noting that plaintiff conceded that product was manufactured as designed and did not allege a manufacturing defect which would be covered by the express warranty at issue).

However, it is premature at this stage to dismiss Plaintiffs' express warranty claim on the grounds that it is based on defective design as opposed to defects in material or workmanship. See Morris v. BMW of N. Am., LLC, Civ. 13-4980 (JLL), 2014 WL 793550, at *11 (D.N.J. Feb. 26, 2014) ("Whether the alleged defect in the Navigation System is caused by defective hardware or software, a design defect or a defect in 'materials or workmanship' remains to be seen."); Alin v. Am. Honda Motor Co., Civ. 08-4825 (KSH), 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."). The ACCAC contains sufficient allegations regarding defects in material and workmanship to support a breach of the express warranties at issue. (ACCAC ¶ 2 ("CAT's CRS is defective."); Id. ¶ 52 ("[T]he CAT CRS cannot, and does

56

not reliably maintain the required thermal management under all conditions and applications as represented."); Id. ¶ 60 (noting that "the CRS cannot reliably regenerate the DPF"); Id. ¶ 66 ("[T]he CRS parts and components were not sufficiently robust to achieve the represented levels of reliability and durability."); Id. ¶ 71 (referring to "defective emissions related parts and components"); Id. ¶ 74 ("CAT breached its warranties by failing to correct the defects in the warranted emission related parts and components.")).[29] Whether the alleged repeated engine failures about which Plaintiffs complain were caused by defective design or defective manufacture is a factual question which this Court cannot resolve on a motion to dismiss.[30]

---

[29] Plaintiffs also allege that the CRS consists of the parts and components expressly warranted under the FECW. (ACCAC ¶¶ 44-57.) The Court need not address Plaintiffs' argument that use of the term "system" in the FECW distinguishes the FECW from other material and workmanship warranties.

[30] Similarly, because Plaintiffs contend, and the Court agrees, that the course of performance is relevant to interpreting the terms and scope of the warranties at issue, the Court declines at this stage to conclusively construe the exact parameters of the Engine Warranty. See U.C.C. § 2-208(1) ("Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."); U.C.C. § 2-208(3) ("Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."). See also Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc., 508 F. App'x 180, 184 (3d Cir. 2012) (noting relevance at summary judgment of the parties' course of performance in construing the scope of

## b.   Unconscionability

Unlike Plaintiffs' course of performance argument, which requires a factual record, Plaintiffs' argument that the terms of the warranties are unconscionable is appropriate for consideration at this stage. Caterpillar argues that Plaintiffs

---

warranty at issue); Morris v. BMW of N. Am., LLC, Civ. 13-4980 (JLL), 2014 WL 793550, at *11 (D.N.J. Feb. 26, 2014) (declining to construe the terms "materials or workmanship" in an express warranty on a motion to dismiss). It is sufficient to now note that Plaintiffs have adequately alleged conduct by Caterpillar (in attempting to repair and replace emissions related parts and components) to support a colorable argument that the alleged defects are indeed covered by the Engine Warranty. The same is true of Plaintiffs' argument that equitable estoppel prevents Caterpillar from seeking to limit their obligations under the Engine Warranty to the express terms therein. See Louisiana Counseling & Family Servs., Inc. v. Makrygialos, LLC, 543 F. Supp. 2d 359, 367 (D.N.J. 2008) ("To establish the elements of equitable estoppel, a party must show (1) a representation or misrepresentation, (2) made with knowledge by the representor that it would induce action, and (3) detrimental reliance on the representation by the claimant."). Plaintiffs allege that "CAT represented to Plaintiffs and the class members that each emission warranty repair/replacement would correct the defect, although it knew or should have known that the CRS would fail again, leading to further engine derating and shutdowns." (ACCAC ¶ 78.) Although Plaintiffs do not allege that Caterpillar explicitly represented that the Engine Warranty covered design defects, the brunt of their Complaint is that Caterpillar made certain repairs during the warranty period which Caterpillar said would repair the defect, despite knowing that the repairs could and would not remedy the defects. As noted above, the Court declines to speculate at this stage whether Plaintiffs sought repair for a defect of design as opposed to a defect of material and workmanship. To support their theory of equitable estoppel, Plaintiffs have adequately alleged that Caterpillar made certain repairs, which it represented would fix the problem, and Plaintiffs relied on that representation to their detriment.

cannot alter the terms of the express warranties based on allegations of unconscionability. The Court agrees.

Plaintiffs allege in the ACCAC that "CAT's Engine warranty is non-negotiable and states it covers only defects in 'workmanship and material.'" CAT also sells warranty extension contracts, which contain the same coverage limitation." (ACCAC ¶ 72a n.3.) Moreover, Plaintiffs allege that "CAT's unilateral restriction in its warranties to cover solely 'workmanship and material' defects is unconscionable in light of CAT's superior knowledge of the CRS design defect and the parties' unequal bargaining power." (Id. ¶ 72b n.4.) Plaintiffs repeat allegations for each state class that "CAT's warranties were adhesive, and did not permit negotiation, or the inclusion of design defects. CAT possessed superior knowledge of the defective design of its CRS prior to offering the Engines for sale. CAT concealed and did not disclose this defect, and CAT did not remedy the defect prior to sale (or afterward). Any effort to otherwise limit liability for the design defect is null and void." (See, e.g., id. ¶¶ 107, 132, 165, 196.)

Generally, there are two types of unconscionability: (1) unfairness in the formation of the contract (procedural unconscionability), and (2) excessively disproportionate terms (substantive unconscionability). Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc., 357 F. Supp. 2d 788, 801 (D.N.J.

59

2005). When considering procedural unconscionability, courts
look to defects in the formation, namely, the parties' "age,
literacy, lack of sophistication," and the presence of "hidden
or unduly complex contract terms, bargaining tactics, and the
particular setting existing during the contract formation
process." Id. When considering substantive unconscionability the
question is more simply whether "the exchange of obligations so
one-sided as to shock the court's conscience." Sitogum Holdings,
Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002). Where
an analysis of such factors supports unconscionability, courts
have broad discretion to fashion an appropriate remedy. See Pyo
v. Wicked Fashions, Inc., Civ. 09-2422, 2010 WL 1380982, at *4
(D.N.J. Mar. 31, 2010). Under the Uniform Commercial Code, "If
the court as a matter of law finds the contract or any clause of
the contract to have been unconscionable at the time it was made
the court may refuse to enforce the contract, or it may enforce
the remainder of the contract without the unconscionable clause,
or it may so limit the application of any unconscionable clause
as to avoid any unconscionable result." U.C.C. § 2-302.[31] "Courts
generally have applied a sliding-scale approach to determine

---

[31] All of the relevant states have adopted U.C.C. Article 2,
except Louisiana. The parties have not indicated that relevant
case law for purposes of this motion differs in any meaningful
way among the relevant states. See Step-Saver Data Sys., Inc. v.
Wyse Tech., 912 F.2d 643, 646 (3d Cir. 1990).

overall unconscionability, considering the relative levels of both procedural and substantive unconscionability." Delta Funding Corp. v. Harris, 189 N.J. 28, 40 (2006). See also Whirlpool Corp. v. Grigoleit Co., 713 F.3d 316, 321 (6th Cir. 2013).

The Court notes at the outset that the terms of the Engine Warranty, limiting the covered defects to material and workmanship and setting a durational limit of two years, are not categorically unconscionable. See Knopke v. Ford Motor Co., Civ. 14-2225, 2014 WL 5817326, at *4 (D. Kan. Nov. 10, 2014) (declining to find five-year/60,000 mile durational warranty substantively unconscionable in light of industry standards and collecting cases); see also Troup v. Toyota Motor Corp., 545 F. App'x 668, 668 (9th Cir. 2013) ("In California, express warranties covering defects in materials and workmanship exclude defects in design."); Cooper v. Samsung Electronics Am., Inc., 374 F. App'x 250, 253 (3d Cir. 2010) (plaintiff alleged that "the design deviated from Samsung's advertisements and packaging. This is not a 'manufacturing defect' that would be covered by this warranty."); Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 527 (7th Cir. 2003) (noting that plaintiff failed to identify any "part of the record showing that a warranty against defective design was part of his contract with any defendant").

It is thus apparent in the present case that the only allegation which could conceivably support a finding of unconscionability is Caterpillar's alleged knowledge of a defect prior to sale. Numerous courts in this District have had occasion to address similar unconscionability arguments in the context of express warranty claims. Two lines of cases have emerged. In the first, courts have permitted breach of express warranty claims to proceed to discovery where plaintiffs sufficiently alleged a manufacturer's knowledge of a defect prior to sale. See In re Samsung DLP Television Class Action Litig., Civ. 07-2141 (GEB), 2009 WL 3584352, at *5 (D.N.J. Oct. 27, 2009) (finding that plaintiffs adequately alleged procedural and substantive unconscionability where defendant knew of defect at time of sale, consumers had no meaningful choice in time limitations of warranty, and there was a significant disparity in bargaining power); Payne v. Fujifilm U.S.A., Inc., Civ. 07-385 (JAG), 2007 WL 4591281, at *5 (D.N.J. Dec. 28, 2007) (noting that plaintiff specifically alleged that defendant knew, or should have known, of the alleged defect in the product and defendant failed to disclose same to members of the class). In the other, courts have granted dismissal motions where plaintiffs alleged a manufacturer's knowledge of a latent defect that would manifest outside the warranty period. See Alban v. BMW of N. Am., Civ. 09-5398 (DRD), 2011 WL 900114, at *9 (D.N.J.

Mar. 15, 2011) ("[A]llegations that [defendant] knew that the sound insulation in [plaintiff's] vehicle would fail after the expiration of the warranty agreement do not indicate that the time and mileage limitation clause was unconscionable."); Nelson v. Nissan N. Am., Inc., 894 F. Supp. 2d 558, 565 (D.N.J. 2012) (same); Gotthelf v. Toyota Motor Sales, U.S.A., Inc., Civ. 11-4429 (JLL), 2012 WL 1574301, at *20 (D.N.J. May 3, 2012), aff'd, 525 F. App'x 94 (3d Cir. 2013) (same). These cases follow from the understanding that "the general rule, stated in [Duquesne], prohibiting breach of warranty actions premised on defects that did not arise until after the warranty expired applies to Plaintiff's claims regardless of [the] assertion that [the manufacturer] knew that his vehicle was defective before the time-limit took effect." Alban, 2011 WL 900114, at *9.[32]

This latter line of cases, rejecting conclusory allegations of unconscionability based on knowledge of a latent defect,

---

[32] The reasoning underpinning the cases rejecting unconscionability arguments premised on knowledge of latent defects is persuasive and applicable to the instant matter. The Second Circuit in Abraham v. Volkswagen of Am., Inc., 795 F.2d 238 (2d Cir. 1986), explained that "[m]anufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time . . . . A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage." Id. at 250. Plaintiffs cannot avoid this reasoning by arguing that their claims concern not only a single defective part like the valve stem seal in Abraham, but an entire emissions control system which was inherently defective.

represents the recent trend in this District and is consistent
with the prevailing approach elsewhere. See T.J. McDermott
Transp. Co. v. Cummins, Inc., Civ. 14-04209 (WHW), 2015 WL
1119475, at *9 (D.N.J. Mar. 11, 2015) ("Plaintiff's allegations
that Defendants knew the tractors had defects does not make the
limitations on their warranties substantively unconscionable.");
Majdipour v. Jaguar Land Rover N. Am., LLC, Civ. 12-07849 (WHW),
2013 WL 5574626, at *20 (D.N.J. Oct. 9, 2013) ("The allegations
that Land Rover knew that the Defect might manifest after the
express warranty term do not implicate the conscionability of
that term."). Generally, these courts have required allegations
of both procedural and substantive unconscionability. See also
Skeen v. BMW of N. Am., LLC, Civ. 13-1531 (WHW), 2014 WL 283628,
at *15 (D.N.J. Jan. 24, 2014) (finding allegations of
unconscionability sufficient to survive motion to dismiss where
plaintiffs pleaded that defendants knew about a defect before or
shortly after initial sales; that the warranties failed to
disclose this fact; that plaintiffs who reported engine problems
were affirmative misled by defendants; and defendants did so
intentionally to allow the warranty to expire); Henderson v.
Volvo Cars of N. Am., LLC, Civ. 09-4146 (DMC), 2010 WL 2925913,
at *9 (D.N.J. July 21, 2010) ("This Court agrees with the Dewey
Court that a manufacturer's mere knowledge that a part will
ultimately fail, after the expiration of a warranty period, is

64

insufficient to provide a basis for a breach of express warranty claim. Moreover, such knowledge does not alone make the time/mileage limitation unconscionable. Here, however, Plaintiffs' allege additional claims in support of their unconscionability claims."); Szymczak v. Nissan N. Am., Inc., Civ. 10-7493, 2011 WL 7095432, at *10 (S.D.N.Y. Dec. 16, 2011) (relying on Henderson and finding allegations sufficient to support unconscionability where plaintiffs alleged that "(1) defendants were aware of the radiator defect, (2) defendants sold the vehicles with knowledge of the defect and of the fact that the defect would not manifest itself until after the expiration of the express warranty, and (3) they would have negotiated better terms in the purchase of their vehicles and the warranties had they been aware of the radiator defect."); Fisher v. Honda N. Am., Inc., Civ. 13-09285 (JAK), 2014 WL 2808188, at *9 (C.D. Cal. June 12, 2014) ("[T]o show that this term was substantively unconscionable, Plaintiff would have to establish that, at the time the warranty was signed, Honda knew (i) that it would not cover the alleged defect because it would not occur until after the warranty period expired and (ii) that no other defects would likely arise while the warranty was in effect."); Knopke v. Ford Motor Co., Civ. 14-2225 (JAR), 2014 WL 5817326, at *5 (D. Kan. Nov. 10, 2014) ("Plaintiff's allegations about Ford's knowledge [of the defect] at the time the warranty

issued are conclusory and unsupported by the facts alleged elsewhere in the Complaint.").

As such, in the present action, the Court finds Plaintiffs' allegations of unconscionability insufficient to alter the terms of the Engine Warranty. First, Plaintiffs have not alleged that Caterpillar knew of a defect which would manifest for the first time beyond the warranty period. Plaintiffs allege instead that Caterpillar knew at the time of sale of an inherent defect in the emissions control system which was so pervasive that they could not have been surprised when purchasers experienced problems and initiated warranty claims immediately after the Engines hit the market. (ACCAC ¶ 66.) Such an allegation places Plaintiffs' pleading squarely in line with the allegations in Alban which were insufficient as a matter of law to allege unconscionability. Plaintiffs contend that Caterpillar's interpretation of the warranties under which Caterpillar would be permitted "to ad infintum [sic] ineffectually 'repair' the defect with the full knowledge that the same issues will continually manifest and recur" renders this case distinguishable from those where courts rejected unconscionability. (Pl. Opp. at 26.) The Court is hard-pressed to understand how Caterpillar's efforts to fulfill their obligations during the warranty period renders its conduct more objectionable than cases where manufacturers were alleged to

have waited-out the warranty period without taking any action to address a known defect.[33] Second, Plaintiffs' allegations offered in support of procedural unconscionability are entirely conclusory. See Alban, 2011 WL 900114, at *1 (calling defendant's alleged knowledge of the defect "mere speculation" and allegations regarding bargain power "conclusory"); Gotthelf, 2012 WL 1574301, at *20 ("Plaintiff fails to sufficiently state facts supporting the applicability of the unconscionability exception to allow his breach of express warranty claim to proceed."). In fact, Plaintiffs repeat these boilerplate allegations for each state class without any specific allegations regarding the characteristics of the particular Plaintiffs or the details of the transaction at issue which would support a disparity in sophistication or bargaining power.[34] Indeed, these allegations are dubious in light of the

---

[33] The Court is unmoved by Plaintiffs' argument that the defect at issue is more severe than ordinary wear and tear because it involves an inherent defect in the emissions control system which appeared before sale and was never corrected. Surely, a plaintiff cannot bolster an allegation of unconscionability simply by more vaguely describing the defect at issue. However, the Court in so stating does not express an opinion as to the viability of Plaintiffs' express warranty claim based on repairs Caterpillar made during the warranty period. See T.J. McDermott Transp. Co. v. Cummins, Inc., Civ. 14-04209 (WHW), 2015 WL 1119475, at *10 (D.N.J. Mar. 11, 2015) (finding allegations that defendants made unsuccessful repair efforts during warranty period sufficient to state a claim for breach of an express warranty).

[34] Plaintiffs note without any citation to authority that "[d]isparity of bargaining power is inherent whenever a

fact that the vast majority of the plaintiffs are corporate entities (ACCAC ¶¶ 6-42), and Plaintiffs repeatedly refer to commercial purchasers like themselves. (Id. ¶ 93.) Moreover, there is nothing in the Complaint to suggest that Plaintiffs were unable to buy comparable vehicles from another seller. See Werwinski v. Ford Motor Co., 286 F.3d 661, 673 (3d Cir. 2002) (noting that "car purchasers—whether ordinary consumers or businesses—may be unable to negotiate the specific details of their automobile warranties, or may be able to select among only limited options" but "do not lack bargaining power" because they "often have the option of buying an extended warranty and "may select among cars of various manufacturers and consider the differences in warranties in making their choice"). Therefore, the Court finds Plaintiffs' allegations of unconscionability insufficient to expand the scope or alter the terms of the Engine Warranty.[35] Because the Court cannot conclude at this

---

manufacturer acts with superior knowledge of a defect but refuses to inform the consumer." (Pl. Opp. at 142.) This is precisely the inference that courts have rejected in the context of unconscionability in express warranties discussed above.

[35] Although the Court rejects Plaintiffs' attempt to alter its terms through allegations of unconscionability, Plaintiffs have adequately alleged a breach of the Engine Warranty based on Caterpillar's alleged failure to repair the defects during the warranty period. Plaintiffs have alleged that Caterpillar, through the Engine Warranty, warranted the Engines to be free from defects in material and workmanship. (ACCAC ¶ 72a.) Plaintiffs specifically allege that each plaintiff "took his vehicle in for warranty service by CAT authorized technicians during the warranty period. CAT's authorized technician

stage that amendment would be futile, this dismissal is without prejudice to a timely motion to reassert a claim for procedural unconscionability.

### c.   Failure of essential purpose

Plaintiffs' claims for breach of express warranty are based on state statutes adopting U.C.C. § 2-313, which provides in pertinent part as follows: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(1)(a). In light of the Court's holding that Plaintiffs' claims under the FECW are preempted, the only express warranty at issue is Caterpillar's Engine Warranty. Under the Engine Warranty Caterpillar "warrant[ed] new 10.3 liter up to and including 18.1-liter engines sold by it for use in powering on-highway vehicles to be free from defects in material and workmanship." (ACCAC ¶ 72.) Plaintiffs have adequately alleged that Caterpillar breached the Engine Warranty because Plaintiffs presented their vehicles for service during the warranty period, and despite repeated attempts, Caterpillar was unable to repair the defect. As such, Plaintiffs have

---

performed the warranty work, but failed to correct the defect despite CAT's representations that it was." (Id. ¶¶ 6-42.) This claim is next addressed in subpart IV.B.1(c), below.

sufficiently pleaded that the Engine Warranty failed of its essential purpose.

The Engine Warranty provides for a limited remedy, namely repair or replacement. "[U]nder Article 2 of the UCC, a court may set aside an exclusive repair-or-replace remedy if it is shown that such remedy has failed of its essential purpose." Telsmith, Inc. v. Bosch Rexroth Corp., 945 F. Supp. 2d 1012, 1015 (E.D. Wis. 2013) (citing U.C.C. § 2-719(2)). See also Viking Yacht Co. v. Composite One LLC, 385 F. App'x 195, 207 (3d Cir. 2010). A repair or replace remedy fails of its essential purpose where the manufacturer is unable to repair the defect within a reasonable time. See, e.g., Myrtle Beach Pipeline Corp. v. Emerson Elec. Co., 843 F. Supp. 1027, 1043 (D.S.C. 1993), aff'd, 46 F.3d 1125 (4th Cir. 1995) ("The limited remedy of repair or replacement fails of its essential purpose if the seller will not or cannot repair or replace the defective product with a conforming product or there is unreasonable delay in repair or replacement."); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 969 (N.D. Cal. 2014) ("According to Plaintiffs, Ford breached the terms of the limited warranty because Ford and/or its dealers were ultimately unable to fix the problems with [integrated in-vehicle communication, navigation and entertainment sytem], and thus the warranty failed of its essential purpose."); David v. Am. Suzuki Motor

Corp., 629 F. Supp. 2d 1309, 1319 (S.D. Fla. 2009) ("The
'essential purposes' exception typically has been limited to
circumstances involving repeated (unsuccessful) efforts to
repair a product that completely fails in its intended use.");
Telsmith, Inc. v. Bosch Rexroth Corp., 945 F. Supp. 2d 1012,
1015 (E.D. Wis. 2013) (noting that a repair-or-replace fails of
its essential purpose "when the seller is unable to repair the
defective goods within a reasonable period of time" (citing
James J. White & Robert S. Summers, Uniform Commercial Code,
Hornbook Series 603 (6th ed. 2010)); Cimino v. Fleetwood
Enterprises, Inc., 542 F. Supp. 2d 869, 888 (N.D. Ind. 2008)
("Plaintiffs in this case have designated admissible evidence
that, if believed by a reasonable jury, could establish that
they complained repeatedly of defects to the warranting parties
and that the defects remained after multiple attempts at
repair."); Strickler v. Peterbilt Motors Co., Civ. 04-3628, 2005
WL 1266674, at *3 (E.D. Pa. May 27, 2005) ("[T]he remedy of
repair or replacement is the 'silver bullet' that the buyer
receives in exchange for parting with an arsenal of legal
remedies. If the limited remedy fails, the 'silver bullet turns
to dust,' leaving the buyer defenseless and at the seller's
mercy, unless the buyer is then permitted to seek the full range
of damages available under Pennsylvania law.") (quotations and
alterations omitted); Barko Hydraulics, LLC v. Shepherd, 2014 WL

4798891, at *5 (Ala. Sept. 26, 2014) ("Given the numerous attempts at repair over the extended period, the jury could properly have concluded that the 495ML loader had not been repaired and that the warranty had failed of its essential purpose."). Whether "a limited warranty has failed its essential purpose is a *question of fact for the jury*." Robinson v. Freightliner LLC, Civ. 08-761, 2010 WL 887371, at *4 (M.D. Pa. Mar. 10, 2010) (quotation omitted). Accordingly, Plaintiffs' pleadings are sufficient at this stage to support their contention that Caterpillar's allegedly unsuccessful repair attempts caused the Engine Warranty to fail in its essential purpose.

Notably however, "failure of essential purpose" is not a breach of contract theory. It is a doctrine by which courts set aside a limited remedy and permit alternative recovery. See U.C.C. § 2-719 cmt. 1 ("[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available" and "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.") Accordingly, Plaintiffs may not invoke the doctrine to void the durational limits of the Engine Warranty.

Similarly, the Court agrees that Caterpillar by virtue of the Engine Warranty did not warrant that the Engines would be free from defects indefinitely. Courts have distinguished between warranties that guarantee repairs and warranties that guarantee a product's future performance. See Ontario Hydro v. Zallea Sys., Inc., 569 F. Supp. 1261, 1266 (D. Del. 1983) ("A warranty of future performance of a product must expressly provide some form of guarantee that the product will perform in the future as promised . . . . On the other hand, a repair or replacement warranty does not warrant how the goods will perform in the future. Rather, such a warranty simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period. Thus, the key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a *remedy* if the product becomes defective, while a warranty for future performance *guarantees the performance* of the product itself for a stated period of time."); Cosman v. Ford Motor Co., 674 N.E.2d 61, 68 (Ill. App. Ct. 1996) ("A promise to repair is simply not a promise of performance. On the contrary, in the arms length atmosphere of the market place, a promise to repair can more honestly be read as an admission that the thing sold might break, rather than a legally enforceable prediction that it will never need tending to."); Ball v. Sony Electronics Inc., Civ. 05-307, 2005 WL

73

2406145, at *3 (W.D. Wis. Sept. 28, 2005) ("[A] written warranty of the type included with the camcorder is an express acknowledgment that the product may be defective and a promise by defendant to remedy such a defect in the manner and within the time period prescribed. Defendant's express promise to remedy defects in a product is not a representation that there are none, but an acknowledgment that there might be."); Kent v. Hewlett-Packard Co., Civ. 09-5341, 2010 WL 2681767, at *6 (N.D. Cal. July 6, 2010) ("HP is not liable for breach of express warranty merely because a product manifests recurring failures during the warranty period. Rather, the question is whether Plaintiffs sought repairs, refunds, or replacements and, if so, whether HP responded appropriately under the warranty."). However, this is not a case where a latent defect manifested after the warranty period. See Chan v. Daimler AG, Civ. 11-5391 (JLL), 2012 WL 5827448, at *6 (D.N.J. Nov. 9, 2012) ("In this case, it is clear that both Chan and Figueroa took their vehicles to the dealership for repair *after* their respective warranties had expired."). Nor is it a case where Caterpillar made repairs during the warranty period which actually fixed the problem. See Bros. v. Hewlett-Packard Co., Civ. 06-02254, 2007 WL 485979, at *4 (N.D. Cal. Feb. 12, 2007) ("[I]t is undisputed that HP replaced Brothers's motherboard at the time he made his in-warranty service claim, and that the replacement motherboard

corrected the asserted screen display problems."); Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1141 (C.D. Cal. 2005) (rejecting plaintiff's argument that defendant's repairs to his laptop during the warranty period "simply masked the problem" until after the express warranty expired).

Nevertheless, Plaintiffs' express warranty claims in the present action are not based on a generalized duty to provide a perfect product which lasts forever. The express warranty claims here are based on the well-established principle that a warranty which is expressly limited to repair or replacement fails of its essential purpose when the manufacturer is unable to successfully repair the defect at issue within a reasonable time. As such, Plaintiffs' express warranty claim based on a breach of the Engine Warranty may proceed at this time.[36]

---

[36] The Court rejects Caterpillar's argument that Plaintiffs have failed to adequately identify the defect at issue and have instead "impermissibly aggregate[d]" the various issues identified in the ACCAC. See In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 971-72 (N.D. Cal. May 30, 2014) (rejecting argument that plaintiffs could not refer generally to multiple repairs for different problems where all of the alleged problems pertained to the same in-vehicle system). Like plaintiffs in MyFord Touch Consumer Litig., in the present case Plaintiffs have alleged an underlying defect within a discrete engine system, namely, the emissions control system. Although the defect may have "manifest[ed] . . . in different ways" for each plaintiff, the ACCAC makes clear that their various problems derived from the same fundamental defect. In such circumstances, "'grouping' is permissible, at least for pleading purposes." Id. at 972.

See T.J. McDermott Transp. Co. v. Cummins, Inc., Civ. 14-04209 (WHW), 2015 WL 1119475, at *10 (D.N.J. Mar. 11, 2015) (allowing plaintiff's express warranty claims to proceed based on allegations that "Defendants made repair efforts during the warranty period, but failed to remedy the substandard materials and workmanship in the tractors' engines, aftertreatment systems, and on-board diagnostic systems."); Beausoleil v. Peterbilt Motors Co., Civ. 10-222, 2010 WL 2365567, at *3 (E.D. Va. June 11, 2010) ("Because Caterpillar's alleged delay in repair provides circumstances that could plausibly cause the remedy provision in the CLW to either fail in its "essential purpose" or to operate to deprive Beausoleil of the substantial value of the bargain, the Defendant's Motion to Dismiss on the expressed warranty claim must be denied."). Accordingly, Plaintiffs have stated a claim for failure of the essential purpose of the Engine Warranty, and Caterpillar's motion to dismiss will be denied with respect thereto.

### d.   Basis of the bargain

Caterpillar further argues that Plaintiffs' express warranty claims should be dismissed because Plaintiffs have not alleged that the express warranty was part of the basis of the bargain as required under the U.C.C. See U.C.C. § 2-313(1)(a) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis

76

of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."). Plaintiffs counter that they have alleged reliance to the extent necessary under the various state laws. The Court agrees.

Applicable law varies from state to state as to the required elements for a breach of express warranty claim. Most states to adopt the U.C.C. identify basis of the bargain or reliance as an element of a breach of express warranty claim. It is apparent from the Court's review of the case law, however, that basis of the bargain is often required to establish the existence of an express warranty, not to establish a breach of an express warranty. As such, courts distinguish between written product warranties and oral representations about the characteristics of a product. Many note that a written express warranty included in a contract for sale does not require a showing of reliance because it is presumed that such a warranty is a basis of the bargain. See Norcold, Inc. v. Gateway Supply Co., 798 N.E.2d 618, 623-24 (Ohio Ct. App. Aug. 11, 2003) ("Comment 3 indicates that UCC 2-313 is relevant to the question of whether an express warranty has been created, and the basis-of-the-bargain rule is not applicable to situations where written warranties are clear and express. A decisive majority of courts that have considered this issue have reached the similar conclusion that reliance is not an element in a claim for breach

of an express written warranty."). Whether addressing a written express warranty, such as that in the instant action, or oral representations regarding a product, the prevailing view holds that the basis of the bargain or reliance requirement is satisfied through circumstantial evidence, particularly the nature of the warranty and the context of the transaction.[37]

---

[37] See Smith v. Merial Ltd., Civ. 10-439, 2011 WL 2119100, at *7 (D.N.J. May 26, 2011) (**New Jersey**) (noting that to establish a breach of an express warranty plaintiff need not prove privity or traditional reliance and that New Jersey's flexible approach to the basis of the bargain requirement only necessitates a showing that "the alleged express warranties were of a kind which naturally would induce the purchase.") (quotations and alterations omitted); Maxwell v. Remington Arms Co., LLC, Civ. 10-918, 2014 WL 5808795, at *4 (M.D.N.C. Nov. 7, 2014) (**North Carolina**) (requiring reliance as an element, but noting that reliance "can often be inferred from allegations of mere purchase or use if the natural tendency of the representations made is such as to induce such purchase or use"); Winston Indus., Inc. v. Stuyvesant Ins. Co., 317 So. 2d 493, 497 (Ala. Civ. App. 1975) (**Alabama**) (finding warranty to be part of the basis of the bargain where language at issue appeared in bill of sale); Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 645 (10th Cir. 1991) (**Colorado**) ("No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; *hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.*") (quoting official comment 3 to C.R.S. § 4-2-313); Horn v. Boston Scientific Neuromodulation Corp., Civ. 409-074, 2011 WL 3893812, at *11 (S.D. Ga. Aug. 26, 2011) (**Georgia**) (same); Ewers v. Eisenzopf, 276 N.W.2d 802, 805 (Wis. 1979) (**Wisconsin**) (same); S. Broad. Grp., LLC v. Gem Broad., Inc., 145 F. Supp. 2d 1316, 1324 (M.D. Fla. 2001), aff'd sub nom. S. Broad. v. GEM Broad., 49 F. App'x 288 (11th Cir. 2002) (**Florida**) ("[T]his Court concludes that the Florida Supreme Court would embrace the modern view that express warranties are bargained-for terms of a contractual agreement, any breach of which is actionable notwithstanding proof of non-reliance at the

However, other states requiring reliance, including Tennessee,

Texas, and Utah, appear to take a less flexible approach. See,

___

time of closing on the contract."); Samuel-Bassett v. Kia Motors
Am., Inc., 34 A.3d 1, 24-25 (Pa. 2011) (**Pennsylvania**) ("A
written express warranty that is part of the sales contract is
the seller's promise which relates to goods, and it is part of
the basis of the bargain."); Norcold, Inc. v. Gateway Supply
Co., 798 N.E.2d 618, 624 (Ohio Ct. App. Aug. 11, 2003) (**Ohio**)
("A decisive majority of courts that have considered this issue
have reached the similar conclusion that reliance is not an
element in a claim for breach of an express written warranty.
Express warranties are "as much a part of the contract as any
other part, and the right to damages on the breach depends on
nothing more than the breach of warranty."); Rite Aid Corp. v.
Levy-Gray, 894 A.2d 563, 573 (Md. 2006) (**Maryland**) ("The clear
implication of Official Comment 7 is that express warranties may
be formed prior to the completion of the sale or even after the
sale has been consummated. What is paramount is the relationship
between the sale of the goods and the affirmations made by the
seller."); In re Bisphenol-A (BPA) Polycarbonate Plastic
Products Liab. Litig., 687 F. Supp. 2d 897, 906 (W.D. Mo. 2009)
(**Missouri**) (noting that reliance is not required but "[f]or a
representation to be part of the bargain, it must be known to
all parties to that bargain. If one party (here, the buyer) is
not aware of the statement, that party cannot claim the
statement became a part of the parties' bargain."); CBS Inc. v.
Ziff-Davis Pub. Co., 75 N.Y.2d 496, 503-04 (N.Y. 1990) (**New
York**) ("This view of "reliance"--i.e., as requiring no more than
reliance on the express warranty as being a part of the bargain
between the parties--reflects the prevailing perception of an
action for breach of express warranty as one that is no longer
grounded in tort, but essentially in contract . . . . The
express warranty is as much a part of the contract as any other
term."); Newman v. Tualatin Dev. Co., 597 P.2d 800, 803 (Or.
1979) (**Oregon**) (finding, at class certification stage, that
plaintiffs' claims for breach of express warranty required
individual determinations of reliance where warranty allegedly
was made in a sales brochure given to all purchasers); but see
Strawn v. Farmers Ins. Co. of Oregon, 258 P.3d 1199, 1213
adhered to on reconsideration, 256 P.3d 100 (Or. 2011)
(distinguishing Newman and finding that determination of
reliance in class action for fraud was susceptible to common
evidence where promise appeared in a written insurance
contract).

e.g., Coffey v. Dowley Mfg., Inc., 187 F. Supp. 2d 958, 969
(M.D. Tenn. 2002), aff'd, 89 F. App'x 927 (6th Cir. 2003)
(requiring to establish a prima facie claim for breach of
express warranty plaintiff must prove "that the buyer was in
fact induced by the seller's acts"); Compaq Computer Corp. v.
Lapray, 135 S.W.3d 657, 676 (Tex. 2004) ("Under Texas law, we
have said that "[r]eliance is . . . not only relevant to, but an
element of proof of, plaintiffs' claims of breach of express
warranty (to a certain extent) . . . ."); Mgmt. Comm. of
Graystone Pines Homeowners Ass'n on Behalf of Owners of
Condominiums v. Graystone Pines, Inc., 652 P.2d 896, 900 (Utah
1982) ("It is generally true that reliance is necessary to
establish a cause of action for express warranty. It is also
true that the existence of reliance, as well as the express
warranty itself, is a factual issue to be determined by the
fact-finder."); Asghari v. Volkswagen Grp. of Am., Inc., 42 F.
Supp. 3d 1306, 1335 (C.D. Cal. 2013) (noting that reliance is
generally not required for breach of warranty claim, but is
required where plaintiff did not purchase directly from the
manufacturer). In some states, like Illinois, "affirmations made
during the bargain are presumed to be a part of it unless clear,
affirmative proof shows otherwise." Wheeler v. Sunbelt Tool Co.,
537 N.E.2d 1332, 1341 (Ill. App. Ct. 1989). Other states,
including Indiana, Michigan, and Minnesota, do not require

reliance. <u>See, e.g.,</u> <u>Essex Grp., Inc. v. Nill</u>, 594 N.E.2d 503, 506-07 (Ind. Ct. App. 1992) ("[R]eliance is not an element of a breach of warranty claim."); <u>Fire Ins. Exch. v. Electrolux Home Products</u>, Civ. 05-70965, 2006 WL 2925286, at *6 (E.D. Mich. Oct. 11, 2006) (finding that that the Michigan statute does not expressly require reliance and reliance is not required where warranty only warranted that product at issue would function as expected); <u>Drobnak v. Andersen Corp.</u>, Civ. 07-2249, 2008 WL 80632, at *7 (D. Minn. Jan. 8, 2008), <u>aff'd</u>, 561 F.3d 778 (8th Cir. 2009) (declining to dismiss express warranty claim for failure to plead reliance).[38]

---

[38] As for Plaintiffs' claim for breach of express warranty under Louisiana law, it is not clear whether Plaintiffs intend to assert a claim in redhibition or for breach of an express warranty. Plaintiffs in Count 23 invoke La. Civ. Code Ann. art. 2520, which pertains to warranties against redhibitory defects. However, courts have distinguished claims in redhibition from express warranty claims which are properly brought under the Louisiana Products Liability Act ("LPLA"). See <u>Touro Infirmary v. Sizeler Architects</u>, 947 So. 2d 740, 744 (La. Ct. App. 2006) ("Courts have consistently held the [Louisiana Products Liability Act] subsumes all possible causes of action, with the exception of a claim in redhibition. Hence, the breach of express warranty is encompassed by the LPLA and is no longer viable as an independent theory of recovery against a manufacturer."); <u>see also</u> <u>In re FEMA Trailer Formaldehyde Products Liab. Litig.</u>, Civ. 07-1873, 2008 WL 5217594, at *10 (E.D. La. Dec. 12, 2008) ("A plaintiff must show that he was induced to use a product because of an express warranty to present a claim for a breach of an express warranty under the LPLA. Further La. Rev. Stat. Ann. § 9:2800.58 provides that a manufacturer is potentially liable only if the express warranty has induced the claimant or another person or entity to use the product.") (citation and quotation omitted). The Court will therefore dismiss Plaintiffs' claim for breach of express

Although the Complaint contains little detail about each Plaintiff's purchase of the engines at issue, it contains sufficient allegations to infer that each plaintiff received or was aware of the Engine Warranty at the time of purchase. Plaintiffs' pleading is thus consistent with cases where courts have found the basis of the bargain or reliance requirement satisfied because the express warranties at issue were part of the purchase agreement or because such elements could be inferred from circumstantial evidence. See Smith v. Merial Ltd., Civ. 10-439, 2011 WL 2119100, at *7 (D.N.J. May 26, 2011) (rejecting argument that plaintiff must prove that she read, saw, or heard advertisements at issue where there was no question that alleged warranty was included with sale of product and no question that plaintiff was aware of it). It is distinguishable from cases where courts have found otherwise. See Maxwell v. Remington Arms Co., LLC, Civ. 10-918, 2014 WL 5808795, at *4 (M.D.N.C. Nov. 7, 2014) (noting that reliance is required under North Carolina law and dismissing claim for breach of express warranty where "Plaintiff never alleged the terms of that warranty, that he received the warranty prior to purchase, or that he otherwise relied on the warranty"); Gross v. Stryker Corp., 858 F. Supp. 2d 466, 502 (W.D. Pa. 2012)

---

warranty under Louisiana law (Count 23) without prejudice to Plaintiffs clarifying the nature of this claim.

(dismissing breach of express warranty claim under Pennsylvania law where plaintiff failed to plead "any details regarding the content of any express warranty, how it was made, that it became the basis of the bargain, or that it was directed at Plaintiff"); In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig., 687 F. Supp. 2d 897, 906 (W.D. Mo. 2009) clarified on denial of reconsideration, Civ. 08-1967, 2010 WL 286428 (W.D. Mo. Jan. 19, 2010) (noting that under Missouri law reliance is not required, but a statement cannot became a part of the parties' bargain if the buyer is not aware of it). Construed liberally in Plaintiffs' favor, the ACCAC permits the inference that the express warranties were part of sales process and that Plaintiffs relied on the express warranties. Therefore, the Court rejects Caterpillar's argument that Plaintiffs have failed to adequately plead basis of the bargain or reliance as required for their breach of express warranty claims.

### e.   "One Million Mile" Representation

Without citation to authority, Plaintiffs contend in briefing that Caterpillar, "through its various marketing materials," expressly warranted that the Engine would perform properly under all conditions and applications for 1,000,000

83

miles.[39] (Pl. Opp. [Docket Item 142] at 32.) Caterpillar, in response, correctly notes that the Complaint only contains a few oblique references to the "One Million Mile" representation. Plaintiffs allege that Caterpillar uniformly marketed the MY 2007 CAT Engines to provide regeneration "under all conditions and all applications," without "unscheduled maintenance" for the expected life of the engine, which Caterpillar represented as 1,000,000 miles. (ACCAC ¶ 58.) Plaintiffs also allege that Caterpillar failed to make successful repairs to the Engines, causing the express warranties to fail in their essential purpose, which Plaintiffs cast as a failure to provide non-defective, emissions related parts and components "which would operate under all operating conditions and all applications for the expected operating life of the Engine without unscheduled maintenance for 1,000,000 miles." (Id. ¶ 78.) Plaintiffs, however, do not mention the "One Million Mile" representation when identifying the express warranties that Caterpillar allegedly breached. (See generally Id. ¶ 72-74.) Nor do Plaintiffs in their individual counts for breach of express warranty claims make any mention of the "One Million Mile" representation. It was therefore not until Plaintiffs'

---

[39] Plaintiffs devote only four sentences of their opposition brief to their attempt to radically extend the scope and duration of the express warranties at issue.

opposition brief that they asserted a third basis for their breach of express warranty claim.

Even if the Federal Rules of Civil Procedure permitted such vague and indeterminate pleading, Plaintiffs' allegations fall well-short of establishing a third express warranty in this action. "An express warranty by a seller is created by: any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, or any description of the goods which is made part of the basis of the bargain." In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig., Civ. 08-939 (DRD), 2009 WL 2940081, at *15 (D.N.J. Sept. 11, 2009) (quotations and alterations omitted). First, the purported marketing statement is insufficiently specific to create an express warranty. See Id.; Hughes v. Panasonic Consumer Electronics Co., Civ. 10-846 (SDW), 2011 WL 2976839, at *21 (D.N.J. July 21, 2011). Second, Plaintiffs have not alleged that any of the Plaintiffs saw or relied upon the alleged marketing statements. Instead, it is only in their opposition brief that Plaintiffs assert for the first time that these statements "became the basis of the bargain between Plaintiffs and CAT." (Pl. Opp. at 32.)[40]

---

[40] Moreover, Caterpillar has provided, and the Court has considered, the marketing brochure in which the alleged marketing statements appear. See Miller v. Clinton Cnty., 544 F.3d 542, 550 (3d Cir. 2008) ("A court may consider an

Therefore, the Court finds Plaintiffs' allegations regarding Caterpillar's "One Million Mile" marketing statements insufficient to create an express warranty.

### f.  Notice

Caterpillar argues that Plaintiffs' express and implied warranty claims are barred because Plaintiffs failed to provide adequate pre-suit notice. Plaintiffs do not appear to dispute that under most state laws applicable to this action notice is required to state a claim for breach of warranty. However, Plaintiffs contend that the notice requirement is intended to eliminate any prejudice to defendants from having to defend against an action stemming from problems about which they were unaware and did not have an opportunity to address prior to

---

undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs claims are based on the document.") (quotation and citation omitted). The marketing brochure contains repeated references to "million-mile durability." Specifically, the brochure states that "Laboratory tests and engine disassembly analyses indicate Cat® C13 engines are expected to have a B50 life of one million miles with Cat's recommended maintenance." (Cat. Ex. 8 [Docket Item 120-1].) Caterpillar explains that "B50 life" is a term of art referring to the mileage at which 50% of engines would require overhaul. The brochure also states that "Thanks to increased displacement, one million miles to overhaul is easily within reach." (Id.) Accordingly, the brochure only identifies one million miles as the mileage at which half of the engines at issue might require overhaul as shown in laboratory tests. The marketing statement is thus far more equivocal than Plaintiffs contend. Consequently, the Court finds such statements more akin to puffery and insufficient to create a third express warranty in this action.

litigation. Plaintiffs maintain that the reasoning underpinning the notice requirement is inapplicable to the instant case because the ACCAC alleges that Caterpillar was aware of the defects at issue even prior to sale, that each of the plaintiffs presented their vehicles for repair on numerous occasions, and Caterpillar represented that the vehicles were fixed despite knowing that the defects were irreparable.

Under Section 2-607 of the U.C.C., a plaintiff must notify the seller of the alleged breach prior to bringing a breach of warranty claim. U.C.C. § 2-607. ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."). State law varies as to what must be pleaded to satisfy the notice requirement. In some states, mere knowledge of a defect or constructive notice prior to suit is not enough, while in others it is. Compare Fowler v. Goodman Mfg. Co. LP, Civ. 14-968, 2014 WL 7048581, at *5 (N.D. Ala. Dec. 12, 2014) (**Alabama**) ("Contrary to plaintiffs' argument, a general awareness on Apple's part of alleged defects in its iPhone does not extinguish the purposes of the notice requirement, nor does it substitute for that requirement under Alabama law.") with Martin v. Ford Motor Co., 765 F. Supp. 2d 673, 683 (E.D. Pa. 2011) (**Pennsylvania**) (finding allegations that defendant was aware for years of axle problems in vehicle due to widespread

87

complaints on the internet and elsewhere and complaints by plaintiffs directly to defendant sufficient to satisfy notice requirement). In others, filing the complaint is sufficient to provide notice. See Strzakowlski v. Gen. Motors Corp., Civ. 04-4740, 2005 WL 2001912, at *3 (D.N.J. Aug. 16, 2005) (**New Jersey**). Elsewhere, such filing is not sufficient. See Hobbs v. Gen. Motors Corp., 134 F. Supp. 2d 1277, 1285 (M.D. Ala. 2001) (filing of a lawsuit itself constitutes sufficient notice only if personal injuries are involved); Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc., Civ. 13-1803, 2014 WL 1048710, at *4 (N.D. Cal. Mar. 14, 2014) ("Given the purpose of the rule, courts have expressly held that the notice must be provided before the lawsuit—notice that is after, or contemporaneous with, the filing of the lawsuit is insufficient."). Moreover, in some states, notice is not required where plaintiff asserts a warranty claim against a remote manufacturer. See Sanders v. Apple Inc., 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009) ("[T]imely notice of a breach of an express warranty is not required where the action is against a manufacturer and is brought "by injured consumers against manufacturers with whom they have not dealt.").

In the majority of states at issue, however, the sufficiency and reasonableness of notice provided to the

defendant is usually a fact question for the jury.[41] Accordingly, the Court declines to exhaustively review the sufficiency of Plaintiffs' allegations regarding notice under each applicable state law. Although notice presents a close question in states where neither constructive notice of the alleged defect, nor filing of the complaint is sufficient to establish notice, such a conclusion would be premature at this juncture.

### 2.    Implied warranty

Caterpillar argues that Plaintiffs' breach of implied warranty claims must be dismissed because the Engine Warranty contains a clear written disclaimer of any such claim. Caterpillar contends this disclaimer is clear and unambiguous and therefore sufficient to bar Plaintiffs' implied warranty

---

[41] See Strzakowlski, 2005 WL 2001912, at *3 (**New Jersey**); Fiberglass Component Prod., Inc. v. Reichhold Chemicals, Inc., 983 F. Supp. 948, 954 (D. Colo. 1997) (**Colorado**); Hobbs v. Gen. Motors Corp., 134 F. Supp. 2d 1277, 1285 (M.D. Ala. 2001) (**Alabama**); Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp., 719 F.2d 1092, 1102 (11th Cir. 1983) (**Florida**); Wal-Mart Stores, Inc. v. Wheeler, 586 S.E.2d 83, 85 (Ga. Ct. App. 2003) (**Georgia**); Maldonado v. Creative Woodworking Concepts, Inc., 694 N.E.2d 1021, 1026 (Ill. Ct. App. 1998), as modified on denial of reh'g (June 12, 1998) (**Illinois**); Duxor Inv. Aktiengesellschaft v. Inv. Rarities, Inc., 1990 WL 57549, at *2 (Minn. Ct. App. May 8, 1990) (**Minnesota**); O'Shea v. Hatch, 640 P.2d 515, 521 (N.M. 1982) (**New Mexico**); Hubbard v. Gen. Motors Corp., Civ. 95-4362, 1996 WL 274018, at *4 (S.D.N.Y. May 22, 1996) (**New York**); Horne v. Novartis Pharm. Corp., 541 F. Supp. 2d 768, 786 (W.D.N.C. 2008) (**North Carolina**); Malkamaki v. Sea Ray Boats, Inc., 411 F. Supp. 2d 737, 743 (N.D. Ohio 2005) (**Ohio**); Hull v. S. Coast Catamarans, L.P., 365 S.W.3d 35, 44 (Tex. App. 2011) (**Texas**).

claims under the applicable state laws. Plaintiffs respond that Caterpillar "puts the cart before the horse" because Plaintiffs do not allege that "the warranties were provided prior to sale, or that any Plaintiffs ever saw any disclaimer prior to purchase." (Pl. Opp. at 33.) Plaintiffs' argument, while technically accurate and superficially appealing, does not hold up.

Under the various state laws, sellers may disclaim the implied warranty of merchantability, although the requirements to do so vary slightly from state to state.[42] The question of whether a disclaimer is conspicuous is a question of law for the Court. See, e.g., Ala. Code § 7-1-201; Larry J. Soldinger Associates, Ltd. v. Aston Martin Lagonda of N. Am., Inc., Civ.

---

[42] See, e.g., Ala. Code § 7-2-316 (**Alabama**) ("[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."); N.J.S.A. § 12A:2-316 (**New Jersey**) (same); Lady Di Fishing Team, LLC v. Brunswick Corp., Civ. 07-402J33, 2007 WL 3202715, at *7 (M.D. Fla. Oct. 29, 2007) (**Florida**) (same); Davenport v. Ford Motor Co., Civ. 05-3047, 2006 WL 2048308, at *4 (N.D. Ga. July 20, 2006) (**Georgia**) (same); Augustine v. Natrol Products, Inc., 13-3129, 2014 WL 2506284, at *5 (S.D. Cal. May 15, 2014) (**California**) ("[A]n implied warranty of merchantability may be excluded in a written document in which the disclaimer is conspicuous and mentions merchantability."); Richard O'Brien Companies v. Challenge-Cook Bros., 672 F. Supp. 466, 469 (D. Colo. 1987) (**Colorado**) ("[T]o exclude the implied warranty of merchantability, the language of the warranty must actually mention merchantability, must be in writing, and must be conspicuous.").

97-7792, 1998 WL 151817, at *4 (N.D. Ill. Mar. 27, 1998); St.
Paul Mercury Ins. Co. v. ADT Sec. Sys., Inc., Civ. 96-7526, 1997
WL 535184, at *3 (E.D. Pa. Aug. 5, 1997); Mitchell v. Taser
Int'l, Inc., Civ. 09-11480, 2014 WL 3611632, at *5 (E.D. Mich.
July 23, 2014); Iron Dynamics v. Alstom Power, Inc., Civ. 06-
357, 2007 WL 3046430, at *4 (N.D. Ind. Oct. 15, 2007).

It is undisputed that Caterpillar's Engine Warranty, upon
which Plaintiffs rely for their express warranty claim, contains
the following disclaimer: "THIS WARRANTY IS EXPRESSLY IN LIEU OF
ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY
OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT
CATERPILLAR EMISSION-RELATED COMPONENTS WARRANTIES FOR NEW
ENGINES, WHERE APPLICABLE." (ACCAC ¶ 72; see also Am. Compl. Ex.
B [Docket Item 105-2.]) The disclaimer is emphasized in bold,
capital letters on the second page of a two-page Engine Warranty
and it explicitly mentions merchantability. As such, there is
little question that such a disclaimer is conspicuous and valid.
With respect to the implied warranty of merchantability, the
written language of the Engine Warranty specifically mentions
merchantability in the disclaimer. In addition, the Engine
Warranty conspicuously uses large, bold capital letters to
exclude both the implied warranties of merchantability and
fitness for a particular purpose. See Beausoleil v. Peterbilt
Motors Co., Civ. 10-222, 2010 WL 2365567, at *4 (E.D. Va. June

11, 2010) (addressing same language in Caterpillar Limited
Engine Warranty and finding it sufficient to preclude breach of
implied warranty claims); T.J. McDermott Transp. Co. v. Cummins,
Inc., Civ. 14-04209 (WHW), 2015 WL 1119475, at *12 (D.N.J. Mar.
11, 2015). Here, because Caterpillar's disclaimer is clear,
conspicuous, and unambiguous, the Court holds as a matter of law
that the disclaimer is valid.

While Plaintiffs are correct generally that a warranty
disclaimer must be seen to be valid, they cannot avoid a
disclaimer by omitting any detail about the transactions at
issue. Plaintiffs through artful pleading cannot avoid a
disclaimer which in most, if not all, states would be valid, if
seen. See Berenblat v. Apple, Inc., Civ. 08-4969, 2010 WL
1460297, at *3 (N.D. Cal. Apr. 9, 2010) (rejecting argument that
disclaimer was invalid because plaintiffs did not receive pre-
sale notice where plaintiffs did not allege that they did not
receive pre-sale notice of the warranty). In fact, under some
state laws, where plaintiff purchases a product from a third-
party, there is no requirement that the purchaser receive a copy
of the disclaimer. See Transp. Corp. of Am. v. Int'l Bus.
Machines Corp., 30 F.3d 953, 959 (8th Cir. 1994) ("Even assuming
that TCA did not receive a copy of the warranty disclaimer,
TCA's claim of breach of implied warranties by IBM fails as a
matter of law" because "operation of Minn.Stat.Ann. §§ 336.2-

92

316, .2-318 extends IBM's disclaimer of implied warranties to TCA as a matter of law."). Moreover, Plaintiffs' suggestion in briefing that they may not have received the Engine Warranty containing the disclaimer undermines their express warranty claims which rest upon the presumption that they received and were aware of this same warranty. See Prousi v. Cruisers Div. of KCS Int'l, Civ. 95-6652, 1997 WL 793000, at *5 (E.D. Pa. Dec. 8, 1997) ("By arguing that the warranty was never delivered, plaintiff is suggesting that there is no operative written warranty (and thus undermining counts I, III, and part of count II of the complaint). This inconsistency is antagonistic to the main thrust of the complaint and seems to implicate estoppel principles.").

Plaintiffs also argue that the disclaimer language only appears in the Engine Warranty, not the FECW. As such, Plaintiffs contend that the express warranties at issue are thus inconsistent and the waiver is unenforceable. To the contrary, the Court finds no inconsistency between the language of the Engine Warranty and FECW. The Engine Warranty expressly excepts the FECW from the disclaimer. That the FECW does not reiterate the disclaimer does not render it inconsistent with the Engine Warranty. The cases Plaintiffs cite are inapposite as they involve situations where the language of two or more express warranties conflict. See Fleisher v. Fiber Composites, LLC, No.

93

Civ. 12-1326, 2012 WL 5381381, at *5 (E.D. Pa. Nov. 2, 2012) ("[W]hen otherwise valid disclaimers conflict with existing express warranties, the disclaimers are deemed inoperative."); Pocono Artesian Waters Co. v. Leffler Sys., Civ. 90-1928, 1991 WL 22075, at *3 (E.D. Pa. Feb. 19, 1991); Viking Yacht Co. v. Composites One LLC, 496 F. Supp. 2d 462, 470 (D.N.J. 2007). Here, the terms of the two express warranties at issue do not conflict. Unlike these cases, Plaintiffs have not identified language in the FECW or in any other representation which could be construed as unreasonably inconsistent with the disclaimer of implied warranties in the Engine Warranty. Moreover, as Caterpillar notes, U.C.C. 2-316 and many of the cases cited by Plaintiffs involve disclaimers of all warranties. The disclaimer language at issue here is more limited and does not disclaim all warranties. Instead, it expressly carves out the FECW and makes clear that FECW remains operative. Therefore, the Court rejects Plaintiffs' argument that the disclaimer is void due to inconsistency. Consequently, the Court will dismiss Plaintiffs' implied warranty claims with prejudice.[43]

---

[43] Because the Court will dismiss Plaintiffs' implied warranty claims based on a valid and enforceable disclaimer, there is no need to reach Caterpillar's arguments regarding merchantability and privity.

### 3. Breach of contract claims

Caterpillar contends that Plaintiffs' claims for breach of contract under Florida, Maryland, and Utah law fail for the same reasons Caterpillar asserts Plaintiffs' express warranty claims must fail. Although the Court has acknowledged that Plaintiffs have omitted any allegations regarding the details of the transactions by which Plaintiffs' purchased the vehicles at issue, the Court does not find the paucity of factual allegations regarding the context of the transaction at issue fatal to Plaintiffs' breach of contract claims, which are pled in the alternative to their breach of warranty claims.

To state a claim for breach of contract under Florida, Maryland, and Utah law, Plaintiffs must allege the formation of a valid contract. See Idearc Media Corp. v. Premier Limousine, LLC, Civ. 08-1695, 2009 WL 482293, at *2 (M.D. Fla. Feb. 25, 2009); LPS Default Solutions, Inc. v. Friedman & MacFadyen, P.A., Civ. 13-0794, 2013 WL 4541281, at *3 (D. Md. Aug. 23, 2013); MEMdata, LLC v. Intermountain Healthcare, Inc., Civ. 08-190, 2010 WL 5136105, at *1 (D. Utah Dec. 2, 2010). Here, although Plaintiffs have not alleged where or from whom they purchased their vehicles, the ACCAC states that the Florida, Maryland, and Utah Plaintiffs were "intended third-party beneficiaries of contracts between CAT and its dealers; specifically, they are intended beneficiaries of CAT's

warranties . . . . The warranty agreements were designed for and intended to benefit the ultimate consumers only." (ACCAC ¶¶ 213, 386, 840.) All three states at issue in Plaintiffs' breach of contract claims recognize the standing of an intended third-party beneficiary to assert a breach of contract claim. See Salt Lake City Corp. v. ERM-W., Inc., Civ. 11-1174, 2013 WL 4782286, at *3 (D. Utah Sept. 5, 2013); Parlette v. Parlette, 596 A.2d 665, 669 (Md. Ct. Spec. App. 1991); Richmond v. Pep Boys-Manny, Civ. 05-304, 2006 WL 1529079, at *4 (M.D. Fla. May 30, 2006). While the Complaint omits detail as to whether Plaintiffs were aware of the Engine Warranty prior to sale, there is no question that the Engine Warranty indeed exists. Accordingly, Caterpillar's challenge to Plaintiffs' breach of contract claims based a failure to plead the existence of a contract is misplaced and unpersuasive. At the very least, the ACCAC adequately alleges that Plaintiffs in Florida, Maryland, and Utah may assert claims for breach of contract as intended third-party beneficiaries.[44]

---

[44] Caterpillar is correct to note that Plaintiffs' recovery under a breach of contract theory would be limited to defects in workmanship and materials within the expressly prescribed warranty period unless enlarged by waiver, course of performance, or failure of essential purpose as discussed above in Section IV.B.1.

### 4.   Consumer protection claims

#### a.   Rule 9(b) - Particularity

Caterpillar argues that Plaintiffs' consumer protection claims under the laws of 16 states[45] must be dismissed because Plaintiffs have failed to plead these claims with particularity as required by Rule 9(b), Fed. R. Civ. P. It is undisputed that Plaintiffs' consumer protection claims may be subject to the heightened pleading standard of Rule 9(b). However, as Plaintiffs note, "courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989); DiMare v. MetLife Ins. Co., 369 F. App'x 324, 330 (3d Cir. 2010). "Nonetheless, even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." Craftmatic, 890 F.2d at 645.

To state a claim for consumer fraud based on an omission, most states require a plaintiff to allege that the defendant failed to disclose material information which induced the

---

[45] Plaintiffs assert claims under the consumer protection laws of the following states: California, Colorado, Florida, Illinois, Indiana, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Texas, and Wisconsin.

plaintiff to enter into a transaction.[46] See, e.g., Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1120 (10th Cir. 2008) (**Colorado**); Benjamin v. CitiMortgage, Inc., Civ. 12-62291, 2013 WL 1891284, at *4 (S.D. Fla. May 6, 2013) (**Florida**); Connick v. Suzuki Motor Co., 675 N.E.2d 584, 595 (Ill. 1996) (**Illinois**). In the present action, Plaintiffs have adequately alleged that Caterpillar failed to disclose information

---

[46] Plaintiffs' consumer protection claims appear to rest primarily on allegations of an omission. However, Plaintiffs dedicate a single paragraph in their opposition brief to their contention that Caterpillar's statement regarding "One Million Maintenance-Free Miles" is a material misrepresentation sufficiently pleaded to support a consumer protection claim. The Court disagrees. Given the dearth of information in the Complaint regarding the circumstances of the transactions at issue, Rule 9(b)'s heightened pleading standard proves problematic for misrepresentation-based consumer fraud claims. As Caterpillar correctly notes, Plaintiffs have not alleged from whom or where Plaintiffs purchased their vehicles. Nor have they alleged that they saw or relied upon a specific misrepresentation by Caterpillar. See Grant v. Turner, 505 F. App'x 107, 111 (3d Cir. 2012) (noting that heightened pleading standard "requires a plaintiff to plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means") (citing Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)); In re Riddell Concussion Reduction Litig., Civ. 13-7585 (JBS), 2015 WL 224429, at *9 (D.N.J. Jan. 15, 2015) (dismissing consumer fraud claim where plaintiffs failed to identify specific statement(s) to which plaintiffs were exposed). A plaintiff's pleading requirement for specificity of the circumstances of affirmative misrepresentations in a consumer fraud context is especially important where the defendant's product in question is only a component of the item the plaintiff purchased in a transaction in which the defendant was not a participant. Plaintiffs' allegations in this regard are almost entirely conclusory, and Plaintiffs' consumer protection claim, to the extent it is based on an affirmative misrepresentation by Caterpillar, must be dismissed.

regarding defects in the Engines to support its consumer fraud claims. The gravamen of Plaintiffs' Complaint is that Caterpillar in October, 2003 endeavored to design an emission control system dependent upon new technology to provide regeneration of particulate matter. (ACCAC ¶ 46.) Over the next three years, Caterpillar designed and tested this new technology. To ensure proper thermal management, which is essential to the functioning of the CRS, the system is equipped with an Electronic Control Module ("ECM") which monitors all systems in the Engine. (Id. ¶¶ 52-53.) The ECM diagnoses and records failures in the system and initiates a range of protective measures from warning light illumination to complete engine shutdown. (Id. ¶¶ 53-54.) Based on the nature of the technology at issue, Plaintiffs allege that Caterpillar "has known since at least 2006, prior to the sales of the MY2007 CAT Engines, that the CRS parts and components were not sufficiently robust to achieve the represented levels of reliability and durability." (Id. ¶ 66.) Nevertheless, Caterpillar brought the engines to market in January, 2007. Id. Thereafter, according to Plaintiffs, CAT tracked emissions related warranty claims and recognized that attempts to correct the defects failed and it "could not produce non-defective emissions related parts and components to repair or replace." (Id. ¶ 68.) Moreover, Plaintiffs allege that "[i]n 2008, internally CAT acknowledged

99

that the entire MY 2007 Engine population was plagued with
repeated reliability issues caused by the CRS system." (Id. ¶
69.) Internal reviews predicted failure rates as high as 99% for
certain parts and components in the course of their expected
operational life. (Id. ¶ 71.) The ACCAC thus plausibly alleges
that Caterpillar had knowledge of defects in the CRS which it
failed to disclose to Plaintiffs.

Contrary to Caterpillar's argument, Plaintiffs' failure to
identify a particular defect does not alter the Court's
analysis. Plaintiffs have alleged with sufficient particularity
that the Engines at issue were plagued by endemic defects in
parts and components related to the emissions control system and
that the precise nature of those defects are in the exclusive
control of Caterpillar.

The Court finds persuasive Judge Walls' reasoning in the
factually analogous case of T.J. McDermott Transp. Co. v.
Cummins, Inc., Civ. 14-04209 (WHW), 2015 WL 1119475, at *1
(D.N.J. Mar. 11, 2015). In T.J. McDermott, plaintiff alleged
that the five long-haul tractors manufactured and sold by
defendants "suffered from defects in their engines,
aftertreatment systems, and on-board diagnostic systems." Id. at
*2. Plaintiff alleged that earlier models experienced
significant problems, which defendant failed to correct. Id.
Plaintiff further alleged that the exact nature of the defect

remained in defendants' exclusive knowledge and control. Id. As here, the vehicles at issue in T.J. McDermott were equipped with on-board diagnostic systems which stored fault codes accessed by authorized service providers during maintenance attempts. Id. Importantly, the court found that plaintiff's allegations regarding information stored and relayed to defendants through the on-board diagnostic systems "adequately describe a means by which Defendants could have learned about the alleged defects." Id. at *6.

In the present case, like plaintiff in T.J. McDermott, Plaintiffs here allege that Caterpillar was aware of reliability and durability problems in the emissions control system prior to the first sales of the Engines at issue. Likewise, as in T.J. McDermott, Plaintiffs allege that the defects in MY2007 Engines immediately manifested after hitting the market and Caterpillar closely monitored these defects through internal tracking procedures. Moreover, Plaintiffs here plausibly allege that Caterpillar's on-board diagnostic system provided a mechanism for Caterpillar to obtain knowledge about the alleged defects – knowledge which, at the pleadings stage, remains in Caterpillar's control. The crux of Plaintiffs' consumer fraud claim is that Caterpillar knew the Engines were defective and irreparable and failed to disclose the inherent defectiveness to Plaintiffs prior to purchase. Numerous courts have permitted

101

consumer fraud claims to proceed under similar circumstances.
See In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 958
(N.D. Cal. 2014) (finding allegations sufficient to support
consumer fraud based on failure to disclose where plaintiffs
alleged that consumer complaints began immediately after first
sales, permitting inference that defendant had knowledge of
defect "on or about the time of rollout"); MacDonald v. Ford
Motor Co., 37 F. Supp. 3d 1087, 1097 (N.D. Cal. 2014) (finding
allegations sufficient to state a claim under the California
Unfair Competition Law where plaintiffs alleged pre-sale
knowledge of coolant pump defect); Doll v. Ford Motor Co., 814
F. Supp. 2d 526, 546 (D. Md. 2011) (allowing plaintiffs'
consumer fraud claims to proceed under the laws of Maryland,
Florida, Maine, and New York where plaintiffs alleged that
defendant concealed and omitted material facts regarding an
inherent defect in the torque converter system); Dewey v.
Volkswagen AG, 558 F. Supp. 2d 505, 527 (D.N.J. 2008) (finding
that plaintiffs' allegations regarding car manufacturers'
failure to disclose to customers inherent design defects in
vehicles' pollen filter gasket areas and sunroof drains). Unlike
cases where plaintiffs alleged a failure to disclose a latent
defect that would manifest outside of the warranty period, see
Herremans v. BMW of N. Am., LLC, Civ. 14-02363, 2014 WL 5017843,
at *12 (C.D. Cal. Oct. 3, 2014) (finding no duty to disclose

under California law where plaintiff's claim was "predicated on a manufacturers' failure to inform its customers of a product's likelihood of failing outside the warranty period"), the instant action is more akin to cases where defendants maintained exclusive or special knowledge of a defect that was not known to consumers. See Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007) (discussing failure to disclose a material fact within manufacturers exclusive control under California consumer protection statutes). Therefore, the Court finds based on the allegations in the ACCAC that Plaintiffs have sufficiently alleged their claims for consumer fraud by failing to disclose a known defect under the various states.[47] On the

---

[47] The Court rejects Caterpillar's argument that Plaintiffs, in asserting consumer fraud claims, merely attempt to recast their breach of warranty claims. Plaintiffs' consumer fraud claims are not based on an allegation that the express warranties constitute misrepresentations. Instead, Plaintiffs allege that Caterpillar failed to disclose a known defect. See Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 442 (D.N.J. 2012) ("Warranty coverage of a particular problem does not, as a matter of law, negate a CFA claim that the manufacturer knowingly omitted information about a design defect."); Doll, 814 F. Supp. 2d at 546 (noting that "a warranty defense is generally unavailable where there are allegations of intentional concealment of a defect or where a defendant has an obligation to disclose the defect"); Matthews v. Am. Honda Motor Co., Civ. 12-60630, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) (rejecting argument that plaintiff "impermissibly attempt[ed] to revive and recast a warranty claim" as a claim under the FDUTPA). As such, there is no concern that permitting Plaintiffs' consumer protection claims to proceed would require manufacturers to disclose every known problem in their product which may require warranty service. The Court merely concludes that Plaintiffs' allegations that Caterpillar knew of inherent

other hand, Plaintiffs' consumer fraud claims based upon affirmative misrepresentations will be dismissed for lack of specificity under Rule 9(b).[48]

### b.  Commercial transactions

Caterpillar argues that Plaintiffs' consumer fraud claims under Indiana, Maryland, Michigan, Minnesota, New York, Oregon, Pennsylvania, and California law must be dismissed because the relevant statutes in these states do not apply to commercial purchasers. Plaintiffs concede that their claims under *Maryland*, *Michigan*, *Oregon*, and *Pennsylvania* law should be dismissed, and the accompanying Order shall so provide. Plaintiffs only argue that their consumer law claims under Indiana, New York, Minnesota, and California law should proceed.

*Indiana*. The Court finds that Plaintiffs lack standing to assert a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA"). The IDCSA creates a cause of action for "unfair, abusive, or deceptive" conduct in connection with a "consumer transaction." Ind. Code Ann. § 24-5-0.5-3(a). The Act defines a "consumer transaction" as the "sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for

---

and irreparable defect in the Engines prior to sale, which may or may not be supported by the evidence, provides a plausible basis for a consumer fraud claims at this stage.
[48] See n.46, supra.

purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things." Ind. Code Ann. § 24-5-0.5-2(a)(1). Although the Complaint is not particularly clear regarding the characteristics of the Plaintiffs, it is apparent that most, if not all, of these plaintiffs are commercial entities that purchased their vehicles for business purposes. Accordingly, the pleadings make clear that Plaintiffs did not purchase the vehicles primarily for "personal, familial, charitable, agricultural, or household" purposes. See In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig., Civ. 05-2623, 2009 WL 937256, at *8 (N.D. Ill. Apr. 6, 2009). Unlike the plaintiff in In re Actiq Sales & Mktg. Practices Litig., 790 F. Supp. 2d 313 (E.D. Pa. 2011), upon which Plaintiffs rely, there can be no argument in this case that Plaintiffs were merely third-parties who facilitated the use of the goods at issue for primarily personal purposes. See In re Actiq Sales & Mktg. Practices Litig., 790 F. Supp. 2d at 326 ("Plaintiff's payments for the drug arose from the sales of Actiq to its members and beneficiaries for the treatment of illnesses, with such transactions qualifying as consumer transactions for personal purposes under the IDCSA."). Therefore, Indiana Plaintiffs lack standing to assert a claim under the IDCSA.

105

*New York*. The Court similarly finds that Plaintiffs lack standing under the New York General Business Law. The New York General Business Law prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). To assert a claim under the Law, "plaintiff must show, inter alia, that defendants' challenged acts and practices are 'consumer-oriented.'" Med. Soc. of State of New York v. Oxford Health Plans, Inc., 790 N.Y.S.2d 79, 80 (N.Y. App. Div. 2005). "'Consumers' are those who purchase goods and services for personal, family or household use." Id. (quotation omitted). "The consumer oriented prong of the Section 349 claim requires a plaintiff to show that the practices complained of have a broad impact on consumers at large; private contract disputes unique to the parties . . . would not fall within the ambit of the statute." Bristol Vill., Inc. v. Louisiana-Pac. Corp., 916 F. Supp. 2d 357, 368 (W.D.N.Y. 2013) (quotation omitted). Plaintiffs argue that the practices at issue in the instant action may extend beyond the parties directly involved and have a broad impact on consumers at large, including nearly 30,000 trucks and buses. In light of the pleadings in this action which involve commercial purchases of vehicles equipped with heavy-duty truck or bus engines, it is implausible that any of the purchasers bought the product at issue for "personal, family or

household use" or that Caterpillar's alleged misconduct would
have a broad impact on "consumers" as defined by the New York
General Business Law. Therefore, the Court will dismiss
Plaintiffs' claims under the New York General Business Law at
this time.

*Minnesota*. The Court rejects at this time Caterpillar's
argument that Plaintiffs lack standing under the Minnesota False
Statement in Advertising Statute and the Minnesota Uniform
Deceptive Trade Practices Act. "'Any person injured' by a
violation of these statutes may bring a civil action as provided
in the Private Attorney General Statute." <u>Kinetic Co. v.
Medtronic, Inc.</u>, 672 F. Supp. 2d 933, 945 (D. Minn. 2009)
(citing Minn. Stat. § 8.31 subd. 3a). "For example, it covers
the individual purchaser of a restaurant in a one-on-one
business transaction . . . but it is not limited to individual
consumers." <u>Id.</u> However, the Eighth Circuit has held that the
Minnesota consumer protection statutes do not apply to
"sophisticated merchant[s]." <u>Marvin Lumber & Cedar Co. v. PPG
Indus., Inc.</u>, 223 F.3d 873, 887 (8th Cir. 2000). The Court is
unable based on the pleadings to conclude that the Minnesota
Plaintiffs fit within the narrow sophisticated merchant
exception to the Minnesota consumer protections statutes.
Therefore, the Court will permit Plaintiffs' Minnesota consumer
fraud claims to proceed at this time without prejudice to

Caterpillar renewing its standing argument upon a developed factual record.

*California*. As for Plaintiffs' claim under the California Unfair Competition Law, Plaintiffs properly note that they have alleged not only a violation of the "unlawful" prong of the CUCL through a violation of the Consumer Legal Remedies Act ("CLRA"), but also violations of the "fraudulent" and "unfair" prongs on the CUCL. "A plaintiff may bring a claim under the CLRA when 'any person' uses a statutorily prohibited trade practice 'in a transaction . . . which results in the sale or lease of goods or services to any consumer.'" Frezza v. Google Inc., Civ. 12-00237, 2012 WL 5877587, at *3 (N.D. Cal. Nov. 20, 2012) (quoting Cal. Civ. Code § 1770). "'Consumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). Because it is clear from the ACCAC that Plaintiffs utilized the Engines for business purposes, Plaintiffs' claim under the CUCL cannot be premised on a violation of the CLRA.[49] Even if Plaintiffs' CUCL claim cannot proceed based on a violation of the CLRA, however, Plaintiffs' claim may proceed based on allegations of fraud and unfairness under the CUCL

---

[49] Plaintiffs concede that they cannot rely on a violation of the CLRA to satisfy the "unlawful" prong of the CUCL.

itself. Therefore, the Court will not dismiss Plaintiffs' CUCL claim at this time.

### c.   Economic loss rule

Caterpillar argues that the economic loss rule prevents Plaintiffs from converting their warranty claims into tort-based statutory claims.[50] Caterpillar asks the Court to adopt the reasoning of the Third Circuit in Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir. 2002), where the Court of Appeals found plaintiffs' claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") barred by the economic loss doctrine. Id. at 681. However, the Third Circuit's reasoning as to the applicability of the economic loss doctrine to Plaintiffs' claims under the Pennsylvania consumer protection statute does not bind this Court as to the law applicable to Plaintiffs' consumer protection claims under Colorado, Minnesota, New Mexico, New York, and North Carolina law. Accordingly, the Court must address Caterpillar's argument as to each state respectively.

*New York*, *New Mexico*, *and Colorado*. The Court rejects Caterpillar's argument that Plaintiffs' consumer protection

---

[50] Caterpillar also argues that Plaintiffs' tort-based claims premised on statements in marketing materials are barred by the economic loss rule or the "gist of the action" doctrine. The Court need not address this argument, however, because Plaintiffs do not appear to assert such claims.

claims are barred by the economic loss doctrine under New York,
New Mexico, and Colorado law because the cases Caterpillar
relies upon involve negligence claims, not claims premised on
fraud or violations of state consumer protection statutes. See
126 Newton St., LLC v. Allbrand Commercial Windows & Doors,
Inc., 993 N.Y.S.2d 558, 561 (N.Y. App. Div. 2014) (negligence
and strict liability); Utah Int'l, Inc. v. Caterpillar Tractor
Co., 775 P.2d 741, 742 (N.M. Ct. App. 1989) (strict liability,
negligence, and failure to warn); Town of Alma v. AZCO Const.,
Inc., 10 P.3d 1256, 1264 (Colo. 2000) (negligence). To the
contrary, courts in these jurisdictions have found the economic
loss doctrine inapplicable to claims of misrepresentation and
fraud. See Weisblum v. Prophase Labs, Inc., Civ. 14-3587, 2015
WL 738112, at *12 (S.D.N.Y. Feb. 20, 2015) (declining to dismiss
negligent misrepresentation and fraud claims involving marketing
of over-the-counter cold remedy based on economic loss
doctrine); Summit Elec. Supply Co. v. Int'l Bus. Machines Corp.,
Civ. 07-0431, 2009 WL 9087259, at *20 (D.N.M. Sept. 30, 2009)
(collecting cases); Clark v. Green Tree Servicing LLC, Civ. 13-
02646, 2014 WL 4783634, at *15 (D. Colo. Sept. 24, 2014)
(finding plaintiff's claim for fraudulent misrepresentation and
for violation of the CCPA not barred by the economic loss
doctrine to the extent they were based upon defendant's false
representations, not a breach of loan modification agreement).

110

Moreover, Caterpillar has failed to cite any binding authority from these jurisdictions indicating that Plaintiffs' consumer protection claims based on allegations of knowing omissions of a material fact are barred by the economic loss doctrine.

*Minnesota and North Carolina*. Whether the economic loss doctrine bars Plaintiffs' consumer protection claims under Minnesota and North Carolina law is a closer question. The Eighth Circuit in applying Minnesota law has recognized that the economic loss doctrine bars common law fraud claims "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold" because such claims are substantially redundant of warranty claims. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 885 (8th Cir. 2000). Importantly, the Court of Appeals in Marvin Lumber dismissed plaintiff's claims under the Minnesota consumer protection statues on other grounds, namely that the Minnesota consumer protection statutes do not apply to a certain "sophisticated merchants" such as plaintiff. Id. at 887. The Eighth Circuit has explained that "a manufacturer who acts solely as a consumer, and does not incorporate the purchased product into the final manufactured item will not be held to be a 'merchant in goods of the kind' for purposes of Minn. Stat. § 604.10(a)." Holden Farms, Inc. v. Hog Slat, Inc., 347 F.3d 1055, 1067 (8th Cir. 2003). As discussed above, based on the

pleadings, the Court cannot conclude that Minnesota Plaintiffs are sophisticated merchants to whom the Minnesota consumer protection statutes do not apply. The Court therefore finds Marvin Lumber unpersuasive because it did not address whether plaintiff's consumer protection claims were barred by the economic loss doctrine and because it appears factually distinguishable from the instant action. Moreover, in Marvin Lumber, the court did not consider explicit statutory language that the economic loss doctrine "shall not be interpreted to bar tort causes of action based upon fraud or fraudulent or intentional misrepresentation or limit remedies for those actions." Minn. Stat. Ann. § 604.10(e); Lester Bldg. Sys. v. Louisiana-Pac. Corp., 2004 WL 291998, at *5 (Minn. Ct. App. Feb. 17, 2004) ("The economic-loss statute precludes recovery for economic loss for certain torts, but the statute specifically states that claims based on fraud are not barred."). Consequently, in the absence of additional authority, the Court rejects Caterpillar's contention that the economic loss doctrine extends to Minnesota consumer protection claims.

As to North Carolina law, Caterpillar relies on Bussian v. DaimlerChrysler Corp., 411 F. Supp. 2d 614 (M.D.N.C. 2006). In Bussian, plaintiff asserted a claim under the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA") based on allegations that defendant possessed superior knowledge

112

regarding the high failure rates of ball joints used in a
vehicle's suspension system, but failed to warn consumers of the
ball joint defect and promoted the ball joints as lifetime
components that were maintenance free. Id. at 625. The court
noted that North Carolina law "prohibits the purchaser of a
defective product from using tort law to recover purely economic
losses." Id. "Tort concepts of safety and risk apply when a
manufacturer negligently produces products that are dangerous to
people or other property, and the manufacturer is responsible
for injuries caused by his negligence. However, this rationale
does not apply where a manufacturer's products simply fail to
'meet the business needs of his customers.'" Id. (quotation and
citations omitted). The court noted that the North Carolina
Business Court extended the economic loss rule to common law
fraud claims and claims under the state consumer protection
statute. Id. The court also discussed approvingly the Third
Circuit's decision in Werwinski finding the economic loss
doctrine applicable to plaintiff's claims for fraudulent
concealment and unfair trade practices based on reasoning that
"because the plaintiffs' claims 'relate to the quality or
character of the goods sold, the claims clearly are intertwined
with . . . their breach of warranty claims.'" Id. at 626
(quoting Werwinski, 286 F.3d at 678). However, the court noted
contrary authority and carefully announced a narrow holding

113

limited to "cases such as the instant case involving allegations of a defective product where the only damage alleged is damage to the product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claim." Id. at 627. Indeed, Plaintiffs cite persuasive authority to support a contrary conclusion. See Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012) ("[T]he North Carolina courts have never addressed whether UDTPA claims are subject to the ELR, and in the absence of such direction, we are well-advised to rely on other grounds."); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014) (holding that "the consumer protection statute here gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule"). The Court agrees with the courts in Ellis and In re MyFord Touch Consumer Litig. that this Court, sitting in diversity, is not bound to find Plaintiffs' North Carolina consumer protection claims barred by the economic loss doctrine in the absence of clear direction from the North Carolina state courts.

### 5. Specific state law issues

Caterpillar contends that certain of Plaintiffs' claims must be dismissed for reasons specific to each state law at issue. The Court will address each in turn.

114

*California*. Caterpillar argues that Plaintiffs fail to plead an "unlawful" business practice under the CUCL. "An unlawful business practice within the meaning of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) is one that is forbidden by law, whether civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." People ex rel. Renne v. Servantes, 86 Cal. App. 4th 1081, 1087 (Cal. Ct. App. 2001). As noted above, Plaintiffs concede that they cannot rely on a violation of the CLRA to satisfy the "unlawful" prong of the CUCL. Instead, Plaintiffs argue that courts applying California law have found violations of California's warranty statutes sufficient to permit a claim under the "unlawful" prong. "However, an alleged breach of a warranty—a contract—is not itself an unlawful act for purposes of the UCL." Elias v. Hewlett-Packard Co., 903 F. Supp. 2d 843, 859 (N.D. Cal. 2012) (quotation omitted). Plaintiffs must therefore allege a statutory violation. Id. Caterpillar contends that a breach of warranty is essentially a breach of contract, not the violation of a statutory duty, but courts have held otherwise. See McVicar v. Goodman Global, Inc., 1 F. Supp. 3d 1044, 1053 (C.D. Cal. 2014) (finding that plaintiff alleged "violation of several laws, including breach of express warranty, California Commercial Code § 2313" and that plaintiff's failure to specifically reference this statute or

other portions of the complaint containing such allegations was irrelevant); Mui Ho v. Toyota Motor Corp., 931 F. Supp. 2d 987, 1000 (N.D. Cal. 2013) (finding allegations regarding violation of California's express warranty statute sufficient to support claims under the unlawful prong of the CUCL). Therefore, the Court rejects Caterpillar's argument that Plaintiffs' claim under the CUCL should be dismissed to the extent it relies on an "unlawful" business practice.

*Minnesota*. Caterpillar argues based on Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc., 603 N.W.2d 336 (Minn. Ct. App. 1999), that Plaintiffs cannot assert a private cause of action for economic damages under the Deceptive Trade Practices Act ("DTPA"). Id. at 340 (noting that Minn. Stat. § 8.31, Subd. 3a provides a private remedy for damages for certain consumer protection statutes, but not the DTPA). However, the Minnesota Supreme Court has noted that although the DTPA is not listed in subdivision 1 of Minn. Stat. § 8.31, the DTPA "contains its own legislative grant of standing and, thus, requires no reference to Minn. Stat. § 8.31." State by Humphrey v. Philip Morris Inc., 551 N.W.2d 490, 496 (Minn. 1996). "It allows any person 'likely to be damaged by a deceptive trade practice of another' to seek injunctive relief. Minn. Stat. § 325D.45, subd. 1 (1994) . . . . Moreover, such injunctive relief is in addition to any relief available at common law for conduct that might also violate this

statute." Id. Therefore, the Court will not dismiss Plaintiffs'
claim under the Minnesota DTPA.

*New Jersey and Florida*. Caterpillar argues that Plaintiffs
have insufficiently pleaded "ascertainable loss" under the New
Jersey Consumer Fraud Act and Florida Deceptive and Unfair Trade
Practices Act. This Court recently addressed what is necessary
to adequately plead ascertainable loss under these statutes. See
In re Riddell Concussion Reduction Litig., Civ. 13-7585 (JBS),
2015 WL 224429, at *13 (D.N.J. Jan. 15, 2015). This Court noted
that "a plaintiff states a claim for damages under the New
Jersey Consumer Fraud Act based on a benefit-of-the-bargain
theory if he or she alleges (1) a reasonable belief about the
product induced by a misrepresentation; and (2) that the
difference in value between the product promised and the one
received can be reasonably quantified." Id. Moreover, "[c]ourts
in this District have required plaintiffs to specify the price
paid for the product and the price of comparable products to
adequately state a claim under the NJCFA." Id. Plaintiffs
attempt to distinguish the instant case from Riddell by
emphasizing that Plaintiffs here have not alleged that
Plaintiffs paid a "price premium" for the product at issue.
However, Plaintiffs make repeated reference to the diminished
value of their vehicles, which even Caterpillar allegedly
recognized internally, (ACCAC ¶ 62), without any attempt to

117

quantify the diminished value in any way. Plaintiffs do not allege the price the market value of their vehicles upon purchase or the current market value of the vehicles given what they allege is pervasive knowledge of the defect in the market. (Id.)

The other cases Plaintiffs rely on from this District are also distinguishable. In Mickens v. Ford Motor Co., 900 F. Supp. 2d 427 (D.N.J. 2012), where the court recognized that plaintiff "need not . . . plead ascertainable loss with pinpoint specificity," plaintiff alleged the cost of replacing the car part at issue as well as the amount he paid to rent a car during repairs. Id. at 446. Likewise, in Maniscalco v. Brother Int'l Corp. (USA), 627 F. Supp. 2d 494 (D.N.J. 2009), plaintiffs included in their complaint the cost of replacing the machines at issue. Id. at 503. Also, in Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84 (D.N.J. 2011), this Court noted that plaintiffs' pleading permitted comparison of the "price they paid for the product as it was represented to the price of a product that is the equivalent for Plaintiffs' purposes of the product actually received." Id. at 102. Plaintiffs have offered no information to enable such comparative analysis. Although Plaintiffs here allege losses stemming from the diminished value of their vehicles and the cost of repeated repairs, the absence of any information to quantify these losses renders their pleading

118

inadequate under the NJCFA as to ascertainable loss. The Court will permit an opportunity to amend the NJCFA claim if Plaintiffs are able to supply, for the New Jersey plaintiffs, a reasonable means of quantifying the difference in value between the product promised and the one received.

The Court is similarly persuaded by Caterpillar's argument under the FDUTPA. In Riddell, the Court noted that under the Florida Deceptive and Unfair Trade Practices Act, "the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." In re Riddell Concussion Reduction Litig., 2015 WL 224429, at *13 (citing Rollins, Inc. v. Butland, 951 So.2d 860, 869 (Fla. Dist. Ct. App. 2006)). Plaintiffs fail to cite any case law to the contrary. In fact, Plaintiffs appear to misread the one case provided in opposition to Caterpillar's argument. See Matthews v. Am. Honda Motor Co., Civ. 12-60630, 2012 WL 2520675, at *4 (S.D. Fla. June 6, 2012) (dismissing plaintiffs claim under the FDUTPA). Beyond conclusory allegations of diminished value, Plaintiffs have not identified this diminished value with any specificity, nor pleaded facts from which such value could be calculated. Plaintiffs' pleading as to ascertainable loss under the FDUTPA is infirm for the same reasons as their NJCFA claim.

119

However, Plaintiffs will have an opportunity to cure this deficiency upon repleading if the Florida plaintiffs are able to allege this difference between the market value of what they received versus the market value of what should have been delivered under their contract.

*Wisconsin.* Caterpillar further argues that Plaintiffs have not alleged the required affirmative representation under the Wisconsin Deceptive Trade Practices Act ("DTPA"). The Wisconsin Supreme Court has held that "a plaintiff asserting a DTPA claim must allege that the defendant has, with the specified intent, made an 'advertisement, announcement, statement or representation . . . to the public,' which contains an 'assertion, representation or statement of fact' that is 'untrue, deceptive or misleading,' and that the plaintiff has sustained a pecuniary loss as a result of the 'assertion, representation or statement of fact.'" Tietsworth v. Harley-Davidson, Inc., 677 N.W.2d 233, 245 (Wis. 2004) (quoting Wis. Stat. § 100.18(1)). However, an omission is insufficient to support a claim under the Act. According to the Wisconsin Supreme Court, "The DTPA does not purport to impose a duty to disclose, but, rather, prohibits only affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading. To permit a nondisclosure to qualify as an actionable 'assertion, representation or statement of fact'

120

under Wis. Stat. § 100.18(1) would expand the statute far beyond its terms." Id. As discussed above, Plaintiffs' consumer protection claims in the instant action are premised on an omission or a failure to disclose a known defect. Such a claim is not permitted under the DTPA as plainly articulated by the Wisconsin Supreme Court.

The Court is unconvinced by Plaintiffs' argument that Caterpillar's omissions should be viewed in conjunction with affirmative statements and representations regarding the Engines. See Agnesian Healthcare, Inc. v. RTF Mfg. Co., LLC, 826 N.W.2d 123 (Wis. Ct. App. Dec. 19, 2012); Christense v. TDS Metrocom LLC, 763 N.W.2d 248 (Wis. Ct. App. Dec. 19, 2008). These cases involved affirmative representations standing alone or in combination with inconsistent omissions to the contrary. The instant case is distinguishable because, as discussed above, Plaintiffs offer very little, if anything, by way of affirmative representations made by Caterpillar regarding the reliability and durability of the Engines prior to sale.[51] Therefore, the Court will dismiss Plaintiffs' claim under the Wisconsin DTPA for failure to allege an affirmative representation.

---

[51] The Court's finding that Plaintiffs' have failed to allege an actionable affirmative representation prior to sale under the Wisconsin DTPA is distinct from the Court's conclusion, infra, that Plaintiffs' adequately allege fraudulent concealment during and after the warrant period which may permit tolling of the statute of limitations.

###### 6. New Jersey implied covenant of good faith and fair dealing

Caterpillar contends that Plaintiffs have failed to allege a breach of an implied covenant of good faith and fair dealing under New Jersey law. "[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." Kalogeras v. 239 Broad Ave., L.L.C., 202 N.J. 349, 366 (2010). Accordingly, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (citations and quotations omitted). New Jersey courts have found an implied covenant of good faith and fair dealing regardless of the type of contract at issue. Wood v. New Jersey Mfrs. Ins. Co., 206 N.J. 562, 577-78 (2011) (finding implied covenant of good faith and fair dealing in insurance policy). "Courts imply a covenant of good faith and fair dealing in order to protect one party to a contract from the other party's bad faith misconduct or collusion with third parties where there is no breach of the express terms of the contract." Kapossy v. McGraw-Hill, Inc., 921 F. Supp. 234, 248 (D.N.J. 1996).

"In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." Wade v. Kessler Inst., 172 N.J. 327, 345 (2002) (quoting Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 434 (App. Div.

122

1990)). Caterpillar argues that Plaintiffs have not sufficiently alleged privity of contract as required to state claim for breach of an implied covenant of good faith and fair dealing. Plaintiffs respond that they have sufficiently alleged the existence of a contract between Plaintiffs and Caterpillar by virtue of the express warranties. However, as discussed above, the ACCAC reveals very little, if anything, regarding Plaintiffs' actual purchases of the engines at issue. This renders the instant case distinguishable from In re AZEK Bldg. Products, Inc., Mktg. & Sales Practices Litig., Civ. 12-6627, 2015 WL 410564 (D.N.J. Jan. 30, 2015), where the court found plaintiffs' allegations that they purchased the product at issue from an actual or apparent agent of defendant and maintained a contractual relationship with defendant as the result of defendant's lifetime warranty which was provided with the purchase of the product. Id. at *7. Plaintiffs' pleading lacks similar allegations which would be sufficient to raise a plausible ground supporting privity. Id. Accordingly, the Court will dismiss Plaintiffs' claim for breach of an implied covenant of good faith and fair dealing under New Jersey law without prejudice to curing the deficiencies noted herein.[52]

---

[52] In light of this conclusion, the Court does not reach Caterpillar's argument regarding bad faith.

### 7.    Ohio negligent design

The Court credits Caterpillar's argument that the Engine

Warranty clearly disclaimed liability for negligence:

> CATERPILLAR EXCLUDES ALL LIABILITY FOR OR ARISING FROM ANY
> NEGLIGENCE ON ITS PART OR ON THE PART OF ANY OF ITS EMPLOYEES,
> AGENTS OR REPRESENTATIVES IN RESPECT OF THE MANUFACTURE OR
> SUPPLY OF GOODS OR THE PROVISION OF SERVICES RELATING TO THE
> GOODS.

(ACCAC, Ex. B at 2.) As discussed above, the Court finds this

disclaimer valid and enforceable, and therefore, effective to

bar Plaintiffs' negligent design claim under Ohio law.

Alternatively, Caterpillar argues that Ohio common law

precludes recovery in negligence for purely economic loss by a

purchaser of a defective product where plaintiff is not in

privity with defendant. Plaintiffs maintain that more recent

case law suggests that Ohio law permits recovery for economic

losses in tort regardless of lack of privity. Plaintiffs also

contend that the cases cited by Caterpillar, namely Norcold and

Midwest Ford, are inapposite because both relied on the balanced

bargaining power between plaintiff and defendant, a factor not

present in the instant action.

Having reviewed the case law, the Court finds that Ohio

courts have distinguished between commercial and non-commercial

purchasers when considering the economic loss doctrine in the

context of tort actions. See Norcold, Inc. v. Gateway Supply

Co., 798 N.E.2d 618, 628 (Ohio Ct. App. 2003) ("[A]bsent privity

of contract, a commercial purchaser of a defective product cannot maintain a claim for purely economic loss under common-law tort theories of recovery."). See also HDM Flugservice GmbH v. Parker Hannifin Corp., 332 F.3d 1025, 1029-30 (6th Cir. 2003); Trgo v. Chrysler Corp., 34 F. Supp. 2d 581, 585 (N.D. Ohio 1998). Moreover, in Trgo, the court squarely rejected Plaintiffs' argument that Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co., 537 N.E.2d 624 (Ohio 1989), permits recovery for purely economic loss in tort regardless of privity. The Trgo court noted that the parties in Chemtrol were in privity of contract, and the Ohio Supreme Court specifically disclaimed considering "whether, absent privity of contract, a plaintiff can recover purely economic losses under tort theory." Trgo, 34 F. Supp. 2d at 594. The Trgo court found that "lower Ohio courts have determined that commercial buyers cannot recover in tort for economic loss" and granted defendant's motion for summary judgment on plaintiffs claim for tortious breach of warranty. Id. Accordingly, Chemtrol is not controlling in the present action, and the Court finds that privity is required for a commercial purchaser to recover purely economic losses in a negligence action under Ohio law. Plaintiffs have alleged no facts and identified no case law supporting their argument that an imbalance in bargaining power between Bolton and Caterpillar compels a different result.

125

Therefore, the Court will grant Caterpillar's motion to dismiss Plaintiffs' claim for negligent design because the Engine Warranty disclaimed such a claim and Ohio law precludes recovery in tort by a commercial purchaser of a defective product for purely economic loss in the absence of privity between plaintiff and defendant.

### 8.    Statute of limitations[53]

Caterpillar argues that regardless of the foregoing, many of Plaintiffs' claims are time-barred. Because the Court will dismiss Plaintiffs' implied warranty claims, the Court need only consider Caterpillar's statute of limitations argument in relation to Plaintiffs' express warranty claims; Plaintiffs' consumer protection claims under California, Colorado, Illinois, New Mexico, North Carolina, and Texas law; and David Brewer's breach of contract claim under Maryland law.[54]

As Plaintiffs properly note in response, the argument that Plaintiffs' claims are time-barred is an affirmative defense and "the burden of establishing its applicability to a particular claim rests with the defendant." Pension Trust Fund for

---

[53] Because the Court declines to dismiss Plaintiffs' claims based on applicable state law regarding the discovery rule, fraudulent concealment, and/or equitable tolling, the Court finds no need to determine whether certain Plaintiffs may rely on the class action tolling doctrine.

[54] Caterpillar does not contend that Plaintiffs' Minnesota consumer protection claims, nor Plaintiffs' Florida or Utah breach of contract claims, are time-barred.

Operating Engineers v. Mortgage Asset Securitization

Transactions, Inc., 730 F.3d 263, 271 (3d Cir. 2013). A statute

of limitations defense may be raised by motion under Rule

12(b)(6) if the limitations bar is apparent on the face of the

complaint. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014);

Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d

954, 969 (9th Cir. 2010). Moreover, the Third Circuit has stated

in the context of the discovery rule that when "the pleading

does not reveal when the limitations period began to run . . .

the statute of limitations cannot justify Rule 12 dismissal."

Schmidt, 770 F.3d at 251 (collecting cases) (quotation and

citation omitted).

The discovery rule applies to Plaintiffs' consumer

protection claims in California, Colorado, Illinois, New Mexico,

North Carolina, and Texas.[55] Generally, the discovery rule delays

---

[55] Caterpillar concedes that the discovery rule applies to
consumer protection claims in all of these states except
California. However, the California Supreme Court has found the
discovery rule applicable to claims under the CUCL. See Aryeh v.
Canon Bus. Solutions, Inc., 292 P.3d 871, 878 (Cal. 2013)
(holding that "the UCL is governed by common law accrual rules
to the same extent as any other statute"). Although the court in
Aryeh noted that not all claims under CUCL would warrant
application of the discovery rule, the court held that the
discovery rule should apply to the extent it would apply under
common law as to "the nature of the right sued upon." Id. By way
of example, the court noted that "just like common law claims
challenging fraudulent conduct, a UCL deceptive practices claim
should accrue only when a reasonable person would have
discovered the factual basis for a claim." Id. (quotation

127

accrual of a cause of action until the plaintiff discovers or in
the exercise of reasonable diligence should have discovered the
false, misleading, or deceptive act. Plaintiffs' allegations
plausibly invoke the discovery rule. The crux of Plaintiffs'
pleading is that Caterpillar knowingly failed to disclose
defects in the Engines before and after the sale of the Engines
at issue. The ACCAC clearly alleges that, as a result of the
defect, Plaintiffs were required to bring their vehicles to
authorized Caterpillar repair facilities. During these repair
attempts, it is alleged, Caterpillar represented to Plaintiffs
that each instance of repair or replacement would correct the
defect, despite knowing that it would not and could not do so.
Indeed, Plaintiffs allege that Caterpillar repeatedly affirmed
that the CRS failures were repairable and that the CRS defects
were corrected following repair and replacement.[56] The ACCAC does

---

omitted). Because Plaintiffs' CUCL claim here is primarily
premised on fraudulent conduct, the discovery rule applies.
[56] Plaintiffs allege that Caterpillar essentially engaged in a
cover-up of the defect by continuing to make ineffectual
repairs. Caterpillar argues that it cannot be liable for conduct
by or representations made by authorized repair facilities
because such facilities cannot be considered Caterpillar's
agents. See Herremans v. BMW of N. Am., LLC, Civ. 14-02363, 2014
WL 5017843, at *7 (C.D. Cal. Oct. 3, 2014) (finding that
plaintiff could not invoke the discovery rule where the
"complaint contain[ed] no allegations that, if proved, would
show that the authorized dealer that presumably repaired her
vehicle was BMW's agent"). However, Plaintiffs' allegations
suggest that Caterpillar directly made the representations at
issue.

not specify when Plaintiffs last sought repair or replacement service on their vehicles, nor can the Court deduce such a fact from anything in the pleading. As such, it is not clear from the Complaint when the statute of limitations period began to run. Caterpillar's assumption in applying the discovery rule that the statute of limitations period began to run 24 months after the purchase date fails to account for the possibility, based on the allegations of fraud and deception by Caterpillar, that Plaintiffs only discovered Caterpillar fraudulent or deceptive conduct sometime after the expiration of the warranty period. Therefore, as to Plaintiffs' consumer protection claims under California, Colorado, Illinois, New Mexico, North Carolina, and Texas law, the Court will deny Caterpillar's motion to dismiss to the extent it is based on a failure to comply with the applicable statutes of limitations.[57]

---

[57] The Court also finds that Plaintiffs have alleged with sufficient particularity that the applicable statute of limitations may be tolled due to fraudulent concealment in California, Illinois and Texas. See Snow v. A. H. Robins Co., 165 Cal. App. 3d 120, 127–28 (Cal. Ct. App. 1985) ("With respect to actions based on fraud, the statute of limitations is tolled whenever plaintiff is able to show the defendant fraudulently concealed facts which would have led him to discover his potential cause of action."); Leonard v. Eskew, 731 S.W.2d 124, 128 (Tex. App. 1987), writ refused NRE (Sept. 16, 1987) ("[T]he statute is tolled when by reason of fraud or concealment the defalcation or dereliction is kept hidden, until such time as knowledge is had of the defalcation, or in the exercise of reasonable diligence it might have become discovered [citations omitted]. Where a relationship of trust and confidence exists between the parties, the rule is that limitation starts to run

As for Plaintiffs' remaining breach of express warranty and breach of contract claims, the Court cannot conclude at this stage that these claims are time-barred. Caterpillar notes in briefing that for warranty claims, the injury generally occurs at the time of purchase, but may occur at the time of the last alleged failure within the warranty period. Caterpillar concedes that Plaintiffs have not alleged the mileage at which they experienced maintenance issues or sought repairs. Nor have they specified whether they purchased the vehicles new or used. As such, it is impossible based on the pleadings to determine the last date on which Plaintiffs sought service on their vehicles for this defect or the amount of time remaining on the warranty at the time of purchase. Nevertheless, Caterpillar contends that many of Plaintiffs' express warranty claims are time-barred. For example, Caterpillar contends that under Indiana law, the four-year statute of limitations applicable to KLS' breach of express warranty claim begins to run on the date the cause of action accrues, which is the date of breach, regardless of plaintiff's knowledge of the breach. Thus, even if KLS' cause of action accrued on the last day of the Engine Warranty's two-year

_____

only from the time of actual discovery of the fraud."); <u>Cont'l Grain Co. v. Pullman Standard, Inc.</u>, 690 F. Supp. 628, 633 (N.D. Ill. 1988) (applying doctrine of fraudulent concealment to Illinois Consumer Fraud Act by which statute of limitations is tolled until five years after plaintiff discovers that he or she has such cause of action).

warranty period, the statute of limitations expired four years hence. KLS, however, filed its complaint six years and two months after its alleged purchase.[58]

Caterpillar's reasoning appears sound and the Court finds that unless Plaintiffs' pleading properly invokes the discovery rule, equitable estoppel or fraudulent concealment, many of Plaintiffs' express warranty claims may be time-barred. Specifically, Caterpillar argues that Plaintiffs' express warranty claims in the following states are time-barred: Colorado, Georgia, Louisiana, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, and Pennsylvania. One if not all of these tolling doctrines apply in all of these states. Having noted above in relation to Plaintiffs' consumer protection claims that these doctrines require a fact-sensitive inquiry, often inappropriate for determination at this stage, the Court finds no need to discuss each state separately.

It is sufficient to offer Plaintiff Ricky Williams' express warranty claim as an example. For these purposes, the Court accepts as true Caterpillar's contention that Williams' claim is barred by the four-year statute of limitations applicable to such claims under Michigan law. See Alongi v. Bombardier Recreational Products, Inc., Civ. 12-13374, 2013 WL 718755, at

---

[58] As noted above, following oral argument, KLS voluntarily dismissed its claims against Caterpillar in this action.

*7 (E.D. Mich. Feb. 27, 2013), appeal dismissed (Aug. 29, 2013) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."). The Court, however, finds sufficient allegations in the ACCAC to toll the statute of limitations based on fraudulent concealment. See M.C.L. § 600.5855 ("If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim . . . ."). Plaintiffs here have alleged with sufficient particularity that Caterpillar continued to make repairs and falsely assured Plaintiffs that the repairs would be effective, which "created an inability for [Plaintiffs] to discover the cause of action." Hennigan v. Gen. Elec. Co., Civ. 09-11912, 2010 WL 3905770, at *6 (E.D. Mich. Sept. 29, 2010). As discussed above, Caterpillar ignores the

132

possibility that its conduct, as sufficiently alleged, could have prevented Plaintiffs from discovering Caterpillar's allegedly wrongful conduct until sometime after the expiration of the warranty period. Additionally, Caterpillar assumes that the warranty period is two years regardless of the option of buying an extended warranty of five years. Consequently, the Court rejects at this stage Caterpillar's argument that Ricky Williams' breach of express warranty claim is time-barred. Caterpillar has provided no reason to conclude differently as to Plaintiffs' express warranty claims in other states.

The Court also rejects on this motion to dismiss Caterpillar's argument that Plaintiffs' breach of contract claim is time-barred under Maryland law. The Court credits for present purposes Caterpillar's argument that David Brewer's claim is time-barred on the face of the Complaint unless a tolling doctrine applies. The statute of limitations for a breach of contract under Maryland law is three years from the date the cause of action accrues. Millstone v. St. Paul Travelers, 962 A.2d 432, 436 (Md. Ct. Spec. App. 2008), aff'd, 987 A.2d 116 (Md. 2010). "In Maryland, a cause of action for breach of contract accrues when the contract is breached, and when the breach was or should have been discovered." Boyd v. Bowen, 806 A.2d 314, 333 (Md. Ct. Spec. App. 2002) (quotation omitted). Calculating expiration of the statute of limitations as, at

133

most, five years from the date of purchase, Brewer's claim is
untimely by over one year.

As to the applicability of fraudulent concealment, however,
the Court finds no reason to conclude differently when applying
Maryland law. Under Maryland law, the fraud of an adverse party
may toll the statute of limitations. Md. Code Ann., Cts. & Jud.
Proc. § 5-203. Plaintiff need not allege "a fraud distinct from
that initially committed for the purpose of keeping the
plaintiff in ignorance of his or her cause of action." Brown v.
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., 731 F. Supp. 2d
443, 452-53 (D. Md. 2010), aff'd, 495 F. App'x 350 (4th Cir.
2012) (citation omitted). Instead, "§ 5-203 applies where two
conditions are met: (1) the plaintiff has been kept in ignorance
of the cause of action by the adverse party, and (2) the
plaintiff has exercised usual or ordinary diligence for the
discovery and protection of his or her rights." Id. (quotation
omitted). Fraud or concealment must be pled affirmatively and
with specificity. Id. Indeed, "the pleadings must demonstrate
specific facts that support a finding of fraud or concealment,
and must go beyond mere conclusory statements." Dual Inc. v.
Lockheed Martin Corp., 857 A.2d 1095, 1105-06 (Md. 2004)
(citation omitted). In the present action, Caterpillar has
presented no authority indicating that Caterpillar's repeated
representations that the repairs would fix the defect at issue

despite Caterpillar's alleged knowledge to the contrary are insufficient to permit Plaintiffs' Maryland breach of contract claim to proceed at this stage.

Therefore, the Court rejects Caterpillar's argument at this stage that Plaintiffs' claims are time-barred.

**V.  CONCLUSION**

In light of the foregoing, the Court concludes that Plaintiffs' claims are not preempted by the Clean Air Act with the exception of their claim for breach of express warranty based on the FECW. The Court finds the allegations in the ACCAC sufficient to support a claim for breach of express warranty based on the Engine Warranty and to invoke the doctrines of course of performance and equitable estoppel to extend the Engine Warranty to design defects. The Court similarly finds Plaintiffs' breach of contract claims adequately pleaded. Likewise, the Court will permit Plaintiffs' consumer protection claims to proceed at this time based on sufficient allegations that Caterpillar had pre-sale knowledge of the alleged defect which it failed to disclose to Plaintiffs. However, for other reasons, the Court will dismiss Plaintiffs' express warranty claim under Louisiana law (Count 23) and Plaintiffs' consumer protection claims under Florida, Indiana, Maryland, Michigan, New Jersey, New York, Oregon, Pennsylvania, and Wisconsin law. The Court will dismiss Plaintiffs' implied warranty claims in

135

their entirety due to the valid and enforceable disclaimer of such claims contained in the Engine Warranty. The Court will also dismiss Plaintiffs' good faith and fair dealing claim under New Jersey law and Plaintiffs' negligent design claim under Ohio law. Finally, the Court, at this pleadings stage of the litigation, rejects Caterpillar's argument that Plaintiffs' remaining claims are time-barred because Plaintiffs' pleadings properly invoke the discovery rule and other tolling doctrines such as equitable estoppel and fraudulent concealment.

With the exception of Plaintiffs' implied warranty claims and their claim for negligent design under Ohio law, dismissal will be without prejudice to Plaintiffs' right to seek leave to amend within 60 days curing the deficiencies identified herein.[59] In the meantime, the Court having addressed all aspects of Caterpillar's dismissal motions, Caterpillar shall file and serve its Answer to the remaining claims within 21 days hereof. An accompanying Order will be entered.

**July 29, 2015**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge

---

[59] The Court will not permit Plaintiffs to file a third consolidated amended complaint as a matter of course because this action has been on the Court's docket for over one year and Plaintiffs have had ample opportunity to amend their pleadings. It is therefore necessary to bring the pleadings stage to a close and narrow the issues for discovery.

136